1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3   UNITED STATES OF AMERICA      * CRIMINAL NO. H-14-637-4
                                  *
4   VERSUS                        *   Houston, Texas
                                  *   September 25, 2017
5   DANIELA GOZES-WAGNER          *   10:30 a.m.

6

7                                  JURY TRIAL
                     BEFORE THE HONORABLE DAVID HITTNER
8                    UNITED STATES DISTRICT JUDGE
                           (JURY SELECTION)
9

10  For the Government:

11          Mr. Michael Chu
            Mr. James D. McAlister
12          U.S. Attorney's Office
            1000 Louisiana Street
13          Suite 2300
            Houston, Texas 77002
14

15  For the Defendant:

16          Mr. T.B. Todd Dupont II
            Dupont and Dupont
17          2500 East T C Jester Blvd.
            Suite 525
18          Houston, Texas 77008

19

20  Court Reporter:

21          Fred Warner
            Official Court Reporter
22          515 Rusk Avenue
            Houston, Texas 77002
23

24  Proceedings recorded by mechanical stenography, produced by
    computer-aided transcription
25

1   Appearances - Con't:

2

3

4   For the Defendant:

5            Mr. Jordan E. Lewis
             Jordan E. Lewis, P.C.
6            1523 Yale Street
             Houston, Texas 77008
7

8            Ms. Abigail Anastasio
             Attorney at Law
9            212 Stratford
             Houston, Texas 77006
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THE COURT:  Thank you, ladies and gentlemen.  Please be seated.

Before we get underway, I am going to ask the attorneys to approach the bench for one moment, so come on up.  Attorneys up here, please.

(Conference before the bench)

THE COURT:  All right.  Now we are on the record.  This is the microphone.

Mr. Dupont, you didn't file any jury questions.  According to Judge Harmon's, Judge Harmon's procedures manual, Section 7B2, they're to be filed in every case even where you assume you are doing voir dire; and it's also in the local rule, our local rule in the Southern District, Appendix B, Section 1481.

How come you didn't file them?

MR. DUPONT:  Your Honor, the Court had indicated to me maybe once or maybe twice, certainly one time, that she was going to allow us 30 minute for voir dire.

THE COURT:  That's right.  Well, in her procedures manual it says, even though you assume that, in most cases you do you need to file them.

Also, I looked through the ones you did.  How can you put a juror in the position of a defendant?  How can you tell a juror, assume, now imagine you are charged with a crime.  How can you do that?

1          MR. DUPONT:  Hypothetical, Your Honor.

2          THE COURT:  Well, let's put it this way.  The case

3  law, you cannot put a juror in the position of a party,

4  whether it's civil or criminal.

5          MR. DUPONT:  The idea behind that question, Your

6  Honor, is a Fifth Amendment question.

7          THE COURT:  Oh, come on.  You can't put anyone in

8  the position, that's in civil cases and criminal cases,

9  state, federal or whatever, that you can't put a juror in the

10  position of a party.

11              Is that your understanding, counsel?

12          MR. CHU:  Yes, Your Honor.

13          THE COURT:  Is that your understanding?

14          MR. DUPONT:  Yes, Your Honor.

15          THE COURT:  I just wanted to bring that to your

16  attention.  Aside from that, I will ask at one point that you

17  stand and introduce your client, okay.

18          MR. DUPONT:  All right.

19          THE COURT:  Let's go.

20              By the way -- hold it, hold it.  Come on up

21  here.

22              I thought only you were the attorney of record

23  in this case.  I see other attorneys here.

24          MR. DUPONT:  I am, Your Honor, yes.  I have given

25  their business cards to the court reporter.  They are

1  assisting me in trial, Your Honor.

2          THE COURT:  All right.  Name.

3          MR. LEWIS:  Jordan Lewis.

4          MS. ANASTASIO:  Abigail Anastasio.

5          THE COURT:  I am just doing this for the record.   I

6  do this in every case so don't take it personally.

7                  How many federal jury trials have you had,

8  federal criminal jury trials have you had?

9          MR. McALISTER:  15.

10          THE COURT:  How many?

11          MR. CHU:  10.

12          THE COURT:  How many?

13          MR. DUPONT:  Four.

14          THE COURT:  Jury trials?

15          MR. DUPONT:  Four federal.

16          MR. LEWIS:  This is my second, Judge.

17          MS. ANASTASIO:  My first, Your Honor.

18          THE COURT:  Okay.  Have a seat.

19                  (In open court)

20          THE COURT:  Now that we have that out of the way, I

21  walk in here now, I see there is a whole pile of -- whoever

22  those are, I want those down, all those boxes down.  So let's

23  take them down right now.  Oh, it's the government's boxes.

24  I want everybody to be able to see, and visa-versa.

25                  By the way, all that's not coming into

1    evidence.  I don't even know what's in there.  I will tell
2    you right from the beginning, it's not coming into evidence.
3    All right, guys.  That ought to be fine.  Thanks.

4                     Ladies and gentlemen, I am Dave Hittner.  I am
5    one of the Judges of the United States District Court for the
6    Southern District of Texas.  I want to welcome you to the
7    next stop on your jury service.  We have a whole bunch of
8    folks here.  I have got that pole.

9                     When I first got here -- I have been here 31
10   years, and I never moved off this floor -- this was the
11   courtroom that the junior judges usually started with, okay.
12   So I was in this court since day one.  I had a pole when I
13   was a state judge for about seven-and-a-half, eight years.  I
14   was elected state judge before I came over here, but I found
15   out I got the best office space in the building.

16                    So what I did, I gathered more and more space;
17   but when I first got here I asked the District Clerk's
18   office -- as a federal judge I was told I could get away with
19   most anything.  I said, I want to get rid of that pole.  So
20   he looks at me, and they had to have an engineer do a study.
21   In fact, someone out here is a structural engineer.

22                    So he came back and he says, they could do it
23   for -- that's 30 years ago -- about $250,000 maybe, could get
24   around that pole with steel girders and everything.  But they
25   say, Judge, it's a weight-bearing pole for the whole

1    building, and we can't guarantee it wouldn't crash in on the
2    8th floor, okay.  So I have a pole.  I had one in state
3    court.  That's why all the jurors are in my line of sight.
4            But, you know, we have so many folks here, I am
5    going to be visiting with you about some of the questions the
6    attorneys have submitted and some of my own.  I am going to
7    come down there and do it.  So let me get all the paperwork
8    here.  Now that I thought about it, do you have a lapel mic?
9    Oh, there it is.
10           So we had a big, fancy system put in here for
11   one of the huge cases that I had a while back.  I had the
12   Alan Stanford financial fraud case, the largest fraud ever
13   tried in the United States.  Mr. Madoff pled guilty.  And
14   this was the largest one ever tried.
15           So because of that, I didn't want to move off
16   this floor or whatever.  They increased it.  They have the
17   people who are hearing impaired, we have that done, we have
18   infrared projectors, those big screens were put up.
19           The biggest problem I have each time, there is
20   a hidden pocket in the judge's robe.  The biggest thing, you
21   have to make sure to find it, So pardon me.  Got it.
22           I am going to come down now and just visit with
23   you for just a moment.  Rather than stand back there, I am
24   going to come visit with you up here.
25           We are about to begin what they call the voir

dire examination.  Now, voir dire is a French term meaning to
see and to speak or to tell the truth or some translation
close to it.  Basically what it is is the opportunity that
the judge or the jurors have or the attorneys have to visit
with you about the case.

I've elected in this case -- in fact, 50
percent of the federal courts in the United States, the
attorneys don't get to ask one question at all.  Some judges
allow them to ask them some questions on their own, but I am
going to be doing the whole voir dire today.  I have gotten
their input on what they feel ought to be asked and some
questions that I usually ask.

Nothing's a hundred percent, so I say 99
percent of the folks that have sat on juries during I guess
about 37, 38 years of trying cases as a judge, have found it
to be a very positive experience, and hopefully you will,
too.

Not that we're any more important.  The federal
judges are a little bit different in what they could do than
the state judges.  We can move a case along a lot quicker
than the state judges can.  So you're going to see me -- I
hope not to do it too often -- to jump into the case to move
it along from time to time.  I don't do it very often, but we
have the authority to do so, which has been upheld by the
U.S. Supreme Court in a number of cases over the years.

1          Actually, everybody serves on a jury.  I am

2    really pleased that you're here today.  We have had a number

3    of cases post Hurricane Harvey, and we are going to move this

4    along as quick as we can.

5          In fact, along that line, I have one question

6    about Harvey.  A lot of us were affected by it.  Do you

7    believe that any issue that you experience because of Harvey

8    would affect your ability to be a member of this jury and

9    give the accused a fair and impartial trial, anybody?

10                         (No Response)

11          THE COURT:  Okay.  No hands.  I am going to move

12    along.

13          Everybody serves on jury duty, even the judges

14    do.  When I was a state judge at the 133rd District Court, I

15    was called to jury duty in state court, actually right on my

16    own floor in the old state courthouse.  There is the

17    ceremonial courtroom now at the courthouse, the old

18    courthouse which now houses the appeals court where I

19    presided for quite a while.

20          In any event, over there in the corner of the

21    jury box are three my own juror badges.  The first one is in

22    state court.  And while I was in the fed, I have been called

23    to jury duty on justice of the peace court and Houston

24    traffic court.  So, oh, no, I go.  We all go.

25          The only thing I can promise to you about

trying a case in here, if you're selected you will see in a
moment it's a really interesting case and it's going to move
along.  You are not going to hear the same question more than
once in any event.

In fact, years ago, I think it was in 2006, I
had a case that lasted a number of weeks, and the lady, one
of the jurors was a school teacher I think in the Katy
Independent School District; and all of students didn't know
why she was down at that courthouse.  I later found that they
thought that maybe she was going to jail or something.

So what happened was the kids wrote me a note,
a card and I blew the card up to a poster size.  Each drew
stick figures of themselves.  And it's right there in the
corner of where the entry to the jury box is, if you are
selected on here.

But I got a great kick as to what they said,
the folks on their card.  It says:  "Dear, Mr. Judge, please
let my teacher come back to school soon.  We really do miss
her," which was very nice.  They probably had a substitute
that they were sick of and ready to get there to see their
teacher, or what the hell.

In any event, I told you that I have been on
the federal court here for a number of years.  Let me tell
you about my workday.  It's a little bit different than most
courts.  We begin our trials at 10:00 a.m. and we adjourn at

6:00 p.m.  Why do I do that?  I had the same hours when I was in the state court.

Because this allows you to miss the rush hour coming in and to be after the rush hour leaving; and it also, though, allows us to get a full day of trial in, meaning a full day of trial, so that's the time that I operate on generally.

Let's talk about this type of court.  It's the United States District Court.  Now what does that mean? Well, in the federal system there are various layers of courts.  Below this Court, sort of, is the United States bankruptcy court, the United States magistrates and their court and almost every agency in the United States, the Veterans Administration, the Energy Department, the Veterans Affairs, the Social Security, they have their own hearing process, and it's presided over by administrative law judges for that particular agency.

If you get through your appeals there you can then appeal to the United States District Court, the one-judge district court.  In fact, we do a good deal of Social Security appeals.  But in any event, this is the last stop where you actually have jurors in the box.

As the case moves up from here, we move into the appellate process.  The United States is divided into 12 appellate circuits, actually 10 plus one special appeals

 1   court that handles basically nothing but patent cases.

 2                I don't know.  I had an opportunity to go on

 3   that court, but a whole career worth of patent cases, I

 4   prefer being right here.

 5                But in any event, so we are part of what we

 6   call the Fifth Circuit.  The Fifth Circuit is comprised of

 7   the states of Texas, Louisiana and Mississippi.  A little bit

 8   of history.  Before 1981 and certainly during the civil

 9   rights era, the Fifth Circuit also went over to take into

10   Alabama, Florida and Georgia; but in 1981 they split the

11   circuits off and we are now the Fifth Circuit, the three

12   cases I mentioned.

13                So a case, if it's appealed from here, the

14   court reporter will type it up, the transcript, the lawyers

15   will write a brief; and the headquarters is in New Orleans,

16   so they have to travel to New Orleans to argue to the Court

17   of Appeals.

18                The Court of Appeals judges come from all three

19   states; and cases from my court, let's say, are assigned at

20   random by a computer.  So, it's a court; but a case from my

21   court could be heard by two judges in Louisiana and one from

22   Mississippi because they are a court.

23                And there's a procedure rarely done where you

24   can still, the whole court, if it's doesn't like what its

25   panel does, they can all hear it together.  So you type it

all up, they go to New Orleans.  And even in the most
interesting of cases they hear only about 20 minutes a side.
The judges go back, they decide who wins and then they go
back to their home cities and they write it up.

Every once in a while they will ask a trial
judge to come sit temporarily on the Court of Appeals, so
you have two circuit judges and one district judge.  I did
that 28 years ago.  They asked me to come when I was a new
judge, to sit on a panel.  I thought it was really cool;
heard five cases, no testimony, just read the record and
wrote two opinions actually for the circuit.  But I have
turned down every request since then even to sit temporarily.

Why?  You need judges to judge other judges.
That's not for me.  I much prefer being here and deal with
the folks, the attorneys, witnesses, jurors and then kick it
upstairs.  And if they think I did something wrong, I will
come back and I'll do it again.  But in any event, that's the
appellate process.

Now, of course, you can appeal your case to the
United States Supreme Court.  They hear cases from all of the
federal circuits in the United States and also from the
Supreme Courts of all the states, but they pick and choose
the cases they want.

And at the end of each session, I go and I call
the Clerk of the U.S. Supreme Court to find out what their

1   statistics are.  For instance, in the last term that they
2   have statistics, 6,475 cases were filed for review at the
3   U.S. Supreme Court.  They actually wrote signed opinions on
4   just 62 cases.  So they take just a few cases that have
5   constitutional import, and that's what they will take.
6           Let's talk about the duration of this trial.
7   Trials in federal court usually take a lot longer than state
8   court.  I mentioned that Stanford Financial case took about
9   three months with the same jury.
10          Years ago I had the three city hall bribery
11  trials, all three.  One took three-and-a-half months, the
12  other two-and-a-half months, another one took about two
13  months, the last one.
14          My colleague, Judge Werlein, about three years
15  ago had a criminal case that was scheduled for seven months
16  that ended in the fifth month.
17          Back about 45, 50 years ago the IBM civil
18  litigation in New York City took over a year with the same
19  jury.
20          I will tell you this, if you are selected to
21  serve on this jury, even as compared to other cases that may
22  be floating around this building, this is an extremely short
23  case for federal court.  The lawyers have said that they will
24  have the testimony over this week.  So it's going to move
25  along.  That doesn't mean it's not important or less

1    important than the IBM litigation.  It's just that it's an
2    extremely short case for federal court.  And the only promise
3    I can make to you is I will move it along, I will move it
4    along, keeping in mind the rights of both parties.
5              We have all seen a lot of TV cases, whether
6    it's *Law and Order*, *Judging Amy*, *JAG*, and this is nothing
7    like it, or I don't think so.
8              I mean, remember old *Perry Mason*.  There was
9    always somebody in the audience that raised, "I did it, I did
10   it."  I have never seen that in all my years, but that's what
11   we have a jury for, that's what we have a jury for.
12             In any event, federal cases also have not been
13   televised, federal trials.  It's just, you'll see, it moves
14   along quickly.
15             Let's talk about burden of proof.  You hear
16   that a lot.  You don't know right now if this is a civil
17   case.  It may be a civil rights case or any kind of a
18   brutality type case or a contract case, admiralty, I've got
19   admiralty jurisdiction, injuries and damage of goods on the
20   high seas that's specifically in federal court; but you don't
21   know if it's a civil or criminal case.  So let's talk about
22   the difference of the burden of proof.
23             Now, if this is a civil case, the scales of
24   justice, picture that, a lot of attorneys use this
25   (indicating).  The plaintiff, the person who brings it, has

1  to prove his or her case by a preponderance of the credible

2  evidence, meaning a very slight tipping of the scale.  And if

3  it's a civil case you will get the instructions on it.

4        Now if this is a criminal case, again, the

5  government must prove its case beyond a reasonable doubt.

6  That's not beyond all doubt, not beyond a shadow of a doubt,

7  but beyond a reasonable doubt.  And if it's a criminal case I

8  will give you that definition at the end of the trial.

9        However, once again, picture the scales of

10  justice.  A much heavier tipping of the scale is required in

11  a criminal case beyond a reasonable doubt, not beyond all

12  doubt, not beyond a shadow of a doubt, but beyond a

13  reasonable doubt, so it's a heavier burden.

14        The basic question that you are going to be

15  getting during this trial, okay, when I visit with you, we

16  all come from different backgrounds.  I have looked.  There

17  are some of you that have been in the military, some of you

18  are in the medical profession or whatever.  And again, I as a

19  judge -- and we have had many lawyers, we have some lawyers

20  on the panel here -- we don't want anyone getting back into

21  that jury room being an expert witness.

22        So when I was on the case, I just sat there and

23  listened only as to what came in because you can only decide

24  as a juror what you hear in the courtroom.  We will get to

25  all the tweeting and the texting later on in the explanation

1  because you can't do that either.  You're supposed to sit and
2  listen to the case as it's presented to you in court.
3             So this is the question I will have for you.
4  Let's say you had, oh, some sort of a background or know
5  somebody who is in the same business as to what this case is
6  about.  The question I am going to have for you over and over
7  again:  Is there anything about that that would prohibit you
8  from being fair and impartial in this case without having
9  heard any of the evidence?   Now, that's the key phrase
10  that's often let out, I mean left out, without having heard
11  any of the evidence, because that's what we want.  We want
12  everybody to start equal.
13             We all come from various backgrounds.  I was a
14  judge sitting on a jury panel, so I at least give both sides
15  an equal start.  I always analogize this to, let's say a
16  hundred-meter race in the Olympics.  All of the runners are
17  in the starting blocks together.  The starting guns off and
18  in effect the race begins.  Same thing with a horse race.
19  All the animals are in the stall together.  When that bell
20  goes off, that's when the race begins.  I am not going to
21  analogize this case to a horse race or to a foot race, but I
22  use that just as a graphic example.
23             Is there anything about what the case is about
24  that would prohibit you from being fair and impartial without
25  having heard any of the evidence?  Can both sides start

1  equal?  So that's going to be the crux of my questions to you

2  as we go through this, okay.

3         Let me tell you about this case.  It's a real

4  interesting case.  I am going to read you a statement of the

5  case, and you'll meet the parties.  As soon as I am through

6  with most of mine, I am going to have the attorneys introduce

7  themselves and their clients or case agent.

8         This case is a criminal case.  Let me mention

9  to you now the difference between your jury service in state

10  court and federal court.  In federal court the jury decides

11  guilt or innocence.  They do not get into the sentencing

12  aspect at all.  They're not to consider what a potential

13  sentence is.

14         When I come back and visit with you after the

15  case, I will tell you about all the background and what the

16  details are.  But you are not to consider that.  So you are

17  not to consider the sentencing aspect in any event.  So

18  that's the biggest difference between the state system and

19  the federal system.

20         There is only one caveat to that, one

21  exception, that in the rare occasion of a federal death

22  penalty case, if the jury finds the defendant guilty then the

23  jury comes back in and assesses the penalty, in that only one

24  type of case.  Aside from that, the jurors have no input at

25  all relative to sentencing and you are not to consider it.

1          So this is the allegation.  Mind you, these are

2   the government's allegations, and we are going to talk about

3   how it gets to this point, okay.  These are the allegations.

4          This is health fraud, a healthcare fraud case

5   involving an alleged scheme to defraud the federal Medicare

6   program.  The government alleges the defendant participated

7   in a scheme involving the submission of claims to Medicare

8   seeking reimbursement for diagnostic services that had not

9   yet been provided.

10          There are two counts that you are going to be

11   asked about.  The first count is conspiracy to commit

12   healthcare fraud.  The second one is conspiracy to commit

13   money laundering.  That's what the case is about.  And it's a

14   real interesting case.

15          In fact, you hear the word conspiracy.  A lot

16   of you, you heard about it.  I am turning to what we call the

17   pattern jury instructions.  Let me tell you what a conspiracy

18   is, bottom line, simplified:  A conspiracy is an agreement

19   between two or more persons to join together to accomplish

20   some unlawful purpose.  It's kind of a partnership in crime

21   in which each member becomes the agent of every other member.

22   That's basically what it is when you hear the word

23   "conspiracy."

24          But you haven't heard any evidence, anything

25   about the case.  I have a bunch of questions to fill in.  But

```
 1  is there anybody here, just because this is the type of case,
 2  without having heard any of the evidence or any other
 3  explanation, feel you couldn't be fair and impartial in this
 4  case?
 5                        (No Response)
 6          THE COURT:  No hands at this point.  That's fine.
 7  We are going to get a little bit more technical as we go
 8  along.
 9                  The first thing I am going to do is to have the
10  attorneys introduce themselves.  And as far as the government
11  goes, we have case agents.  And as far as the defendant goes,
12  we have the defendant herself.
13                  So, ladies and gentlemen, I am going to have
14  them come forward, introduce themselves and their clients or
15  their case agents.
16                  The government's got the burden of proof.  We
17  are going to talk about that in a minute.  But I will allow
18  them to do it at this time.
19                  Counsel.
20          MR. CHU:  Thank you, Your Honor.
21                  Good morning.  My name is Michael Chu.  This is
22  Jim McAlister.  We are both assistant united states
23  attorneys.  And although we work for the Department of
24  Justice, we have lived and worked this case for several
25  years.
```

1           THE COURT:  You live where?

2           MR. CHU:  In Houston.

3           THE COURT:  Okay.  For two years?

4           MR. CHU:  Several years.

5                   Your Honor, does the Court also want me to list

6    our witnesses as well?

7           THE COURT:  Yes.  I will read the list.  I have the

8    list of witnesses.

9                   Who else do you have with you?

10          MR. CHU:  Your Honor, we also have Task Force

11   Officer William Marlowe.  He is part of an FBI Healthcare

12   Fraud Task Force.  He was a sergeant on this case, or he is

13   now a lieutenant with the Texas Attorney General's office

14   Medicare Fraud Division.

15                  We also have Andres Gomez here.  Andres is a

16   Special Agent with Health and Human Services.  You may or may

17   not also see a few other FBI agents in the court.  We'll talk

18   about those in a few minutes.

19                  Thank you.

20          THE COURT:  Now for the defense, counsel.

21          MR. DUPONT:  Thank you, Your Honor.

22          THE COURT:  Yes, sir.

23          MR. DUPONT:  I'm Todd Dupont.  Good morning.  With

24   me I have Ms. Abigail Anastasio, who is trying the case with

25   me, as well as Mr. Jordan Lewis.

1          My client is Ms. Daniela Gozes-Wagner.

2          THE COURT:  Can you see?  Everybody, they can't see.

3  Would you step forward, ma'am, please.

4          MR. DUPONT:  My client, Ms. Daniela Gozes-Wagner.

5  Thank you.

6          THE COURT:  Yes, sir.  Thank you.

7          Now, we talked about the burden of proof.  I

8  want to go into that a little further.  I am going to use

9  let's say a traffic ticket, not you, but maybe somebody you

10 know gets a traffic ticket.  Now that's a criminal matter.

11 What needs to be done?  The person who allegedly runs a red

12 light doesn't have to take the stand or to say anything.  The

13 burden is on the government to prove each element by beyond a

14 reasonable doubt.

15         So usually you get a police officer on the

16 stand who says, where were you?  Were you within the

17 jurisdiction of the court?  Let's say it was within the City

18 of Bellaire.

19         Yes, it was in the City of Bellaire.

20         And what happened?

21         He said, well, there's a stop sign, and we saw

22 the defendant go through the stop sign, or the defendant was

23 speeding, and you hear all of that evidence.

24         And the defendant doesn't have to say a word.

25 And if the police officer doesn't show up, very often it's

dismissed for want of prosecution.  Maybe some of you have
been there.  But there is no obligation on the defendant in
any criminal case to take the stand.

And there's some real high-profile cases you
have known, they've come back, some guilty, some not guilty
where the defendant doesn't have to take and will not be
required to take the stand.  That's the burden of the
government.  Every defendant is presumed to be innocent until
the government meets its burden and proves every element, in
this case of money laundering and conspiracy for healthcare
fraud, conspiracy for money laundering beyond a reasonable
doubt as to each element, and I will get into each element
later on.  That's the absolute key, the presumption of
innocence.

So, in effect, the defense attorney doesn't
even have to ask one question -- I am sure he will -- or
present any evidence.  Perhaps he will.  I don't even know
and I cannot inquire whether the defense will put any
testimony on, whether they will call the defendant.  It's not
the concern of the system.  The system requires the
government to prove each element beyond a reasonable doubt,
and you're presumed to be innocent.

In fact, if you keep in mind some third world
countries, non democracies usually, third world countries, if
you're arrested in that country, you're presumed to be guilty

1   and you have got to prove yourself innocent.  Just think of

2   that.  That's never been the rule of law here based upon

3   English common law during the time that we were colonies and

4   of course certainly to the present time.  There is no

5   obligation the defendant has to take the stand to say

6   anything, and the burden never shifts to the defendant.

7   It's always on the government.

8               Anybody have any concern with that as an

9   absolute right under our Constitution?

10                    (No Response)

11          THE COURT:  I firmly believe in it, and I gather you

12  do, too, and you understand it, you have to understand that.

13              Let's talk about an indictment.  We have all

14  heard like a jury handed down an indictment.  Well, you could

15  have been called up right now to serve on a grand jury.  I

16  know one of our jurors has served on a grand jury at one

17  time, I believe.

18              But what a grand jury is is a group of

19  citizens, usually in the federal side 23, and you are

20  selected just like this.  The next panel coming up might be

21  for grand jury, which is 18 months to serve on a grand jury.

22  But this is a trial jury.  So you get called, and at that

23  point you sit and you listen only to the government's side.

24  You don't hear from the defense side at all.  You got a case

25  coming up, whether it's an alleged illegal reentry or in this

1   case healthcare fraud, and you as the grand jury hear just
2   one side of the case, one side of the case.

3           If you as the grand jury say, well, hearing one
4   side of the case we think it should be tried by a trial jury,
5   over simplification, that's what a grand jury does.  It
6   listens just to the government and it makes a reference to
7   trial.  So handing down an indictment means that we have
8   heard one side of the case and therefore no
9   cross-examination, the defendant is not there, his or her
10  lawyer is not there.  Based upon that we think a trial jury
11  should handle it.  So that's what that's all about.

12          I am going to get down probably to a few
13  general questions and then to some individual questions.  We
14  can move pretty quickly through this.

15          Let's see.  Here it is, okay.  Has anybody --
16  this case was investigated by the FBI, the Department of
17  Health and Human Services, the Office of Inspector General
18  and the Texas Attorney General's office Medicaid Fraud
19  Control Unit.  To the best of your knowledge have you or any
20  member of your family or any of your close friends had any
21  experiences positive or negative with these agencies?

22          Yes, ma'am.  No. 8, if you would stand up.  May
23  I have a list of the jurors' names, please.

24          PROSPECTIVE JUROR NO. 8:  The Department of Health
25  and Human Services, I used to work for the National Institute

1  of Health and other parts of the Public Health Service and

2  did a fellowship at the Center for Disease Control and

3  Prevention.

4           THE COURT:  Is there anything about that that would

5  prohibit you from being fair and impartial in this case

6  without having heard any of the evidence?

7           PROSPECTIVE JUROR NO. 8:  No.

8           THE COURT:  Thank you, ma'am.

9                Yes, ma'am.  If will you stand up.  That's

10 Juror No. 13.

11          PROSPECTIVE JUROR NO. 13:  I am currently involved

12 with the FBI.  My first-born son is the only American

13 journalist being held captive anywhere the world.  He has

14 been held captive in Syria for five years now, and so we are

15 very involved with the FBI on a almost daily basis.

16          THE COURT:  All right.  Let me ask you this, and

17 only you can answer this.  Would that affect your ability to

18 be fair and impartial in this case without having heard any

19 of the evidence?

20          PROSPECTIVE JUROR NO. 13:  Absolutely not.

21          THE COURT:  Thank you, ma'am.

22               Yes, ma'am.  Hang on a second.  I have to get

23 my -- everybody is on a list now.  I'm on a list, too.  I am

24 on some other list that you don't want to even know about.

25               Yes, ma'am.

1          PROSPECTIVE JUROR NO. 25:  I have worked with some,
2    had to deal with Health and Human Services in regards to my
3    mother-in-law in the past.
4          THE COURT:  What was the concern?
5          PROSPECTIVE JUROR NO. 25:  She went on Medicaid.
6          THE COURT:  Okay.  Do you have a problem with that?
7          PROSPECTIVE JUROR NO. 25:  No.
8          THE COURT:  There was no problem with the agency?
9          PROSPECTIVE JUROR NO. 25:  There was no problem with
10   the agency, but it's just a lengthy process.
11         THE COURT:  Anything about that make you unable to
12   be fair and impartial without having heard one bit of
13   evidence?
14         PROSPECTIVE JUROR NO. 25:  (Indicating in the
15   negative).
16         THE COURT:  Anybody else?
17         PROSPECTIVE JUROR NO. 40: (Indicating).
18         THE COURT:  Yes, ma'am.  That's Juror No. 40.  Yes,
19   ma'am.
20         PROSPECTIVE JUROR NO. 40:  I have dealt with the
21   same department for my parents.  I had no problems with them.
22         THE COURT:  No problem.  Nothing about that would
23   prohibit you from being fair and impartial in this case?
24         PROSPECTIVE JUROR NO. 40:  No.
25         THE COURT:  Okay.  Thank you.

1           Yes, sir.

2           PROSPECTIVE JUROR NO. 12.  Yes.

3           THE COURT:  My note says you're Juror No. 12, yes.

4           PROSPECTIVE JUROR NO. 12:  Yes.  My brother-in-law.

5  You mentioned the State of Texas.  My brother-in-law is an

6  assistant district attorney for the State of the Texas.

7           THE COURT:  Look, I understand.  That's on your

8  sheet.

9           PROSPECTIVE JUROR NO. 12:  You know --

10          THE COURT:  Hold it.  Is there anything about that

11  that you feel that this may not be the best jury for you

12  about that?

13          PROSPECTIVE JUROR NO. 12:  No.

14          THE COURT:  So you could be fair and impartial?

15          PROSPECTIVE JUROR NO. 12:  Yes.

16          THE COURT:  Okay.  Thank you so much.

17          Yes, ma'am.

18          PROSPECTIVE JUROR NO. 26.  I've worked with special

19  agents in the FBI on two occasions.  On one occasion it was a

20  criminal referral of a case I was working on involving bank

21  fraud.  And in another case I was able to provide some

22  evidence in connection with an investigation.

23          THE COURT:  As to what?

24          PROSPECTIVE JUROR NO. 26:  In connection with an

25  investigation they were doing.

1           THE COURT:  Okay.  What sort of the investigation,

2  unless it's confidential?

3           PROSPECTIVE JUROR NO. 26:  I think it's

4  confidential.

5           THE COURT:  Anything to do with healthcare fraud?

6           PROSPECTIVE JUROR NO. 26:  No.

7           THE COURT:  Is there anything about that that would

8  prohibit you from being fair and impartial in this case?

9           PROSPECTIVE JUROR NO. 26:  No.

10          THE COURT:  Yes, ma'am.

11          PROSPECTIVE JUROR NO. 20:  Juror 20.  I, as well as

12  what the lady mentioned about the Medicaid program, I was

13  involved with my mother-in-law as well.

14          THE COURT:  Any problems with that?

15          PROSPECTIVE JUROR NO. 20:  Not as of yet.

16          THE COURT:  Well put.  So as of right now you have

17  no concern about being on this jury?

18          PROSPECTIVE JUROR NO. 20:  Right.

19          THE COURT:  Okay.  Fair enough.

20               Yes, ma'am.

21          PROSPECTIVE JUROR NO. 28:  I am an elementary

22  compliance coordinator, and I interact fairly often with

23  Health and Human Services.

24          THE COURT:  Federal?

25          PROSPECTIVE JUROR NO. 28:  For children that are

```
 1  either in foster care or homeless.  And we also do billing
 2  for Special Ed services through -- and I need you to tell me,
 3  is it Medicare or Medicaid?
 4          THE COURT:  Okay.  Well, let me ask the government.
 5          MR. CHU:  Primarily Medicare, but I think there may
 6  be a little bit of Medicaid.
 7          PROSPECTIVE JUROR NO. 28:  All right.  So I just
 8  wanted to express that.
 9          THE COURT:  Now you know.  See, the case has
10  started.  You have got a bit of information.
11          Okay.  Thank you.
12          Anybody else?
13                      (No Response)
14          THE COURT:  We are going to talk about law
15  enforcement officers.  We will be talking about folks in the
16  law enforcement business.  I am going to read you this
17  question.
18          To the best of your knowledge have you or any
19  member of your family or any of your close friends had any
20  experiences with local, state or federal law enforcement
21  officers that left you with a strong feeling good or bad
22  about law enforcement officers where you couldn't be fair in
23  this case?  Anyone fall into that category?
24          Yes, ma'am.
25          PROSPECTIVE JUROR NO.  No. 20.
```

1          THE COURT:  Okay.  We'll call you up later.  We will
2     call you up later.  Ellen, if you will make a note.  When I
3     say "call you up," just out of the hearing of the jury.
4               Now let's talk about, you're going to have some
5     law enforcement people taking the stand, and this is a very
6     classic question that's asked in most every certainly
7     criminal case, occasionally in the civil cases; it has to do
8     with law enforcement.
9               Everybody has to do something for a living.  We
10    all understand that.  Some folks are in law enforcement.  The
11    question I have -- and it's going to be a convoluted question
12    and it sounds almost rhetorical, but I will fill it in a
13    moment -- would you give undue influence, undue influence,
14    believability or non-believability to someone who earns his
15    or her living as a law enforcement officer specifically
16    because they're a law enforcement officer or could you weigh
17    that testimony together with all of the other testimony from
18    other citizens that will be here?
19              Anybody have a problem with giving equal weight
20    and not too much or too little, but just in your own mind
21    listen to it and give it whatever weight you think it should
22    be objectively.  Anybody have a problem with that?
23                        (No Response)
24         THE COURT:  Okay.  Thank you.  No hands.  And we're
25    moving right along.

1          Oh, yeah.  There's a question here also about

2   circumstantial evidence, okay.  You are going to get some

3   directions later on about circumstantial evidence, that

4   you're to consider them both equally, and the law makes no

5   distinction between the weight you give to either

6   circumstantial evidence or direct evidence just because it's

7   proved by circumstantial.

8          Let me give you an example.  Direct evidence is

9   that which an eyewitness sees.  You're outside and boy it's

10  raining and you're getting soaked.

11          The other thing is, let's say you're on a jury

12  and you hear -- and there's no windows in this room, I hear a

13  rumbling going on, a lot of it; and then all of a sudden

14  somebody comes through that back door soaking wet with a

15  raincoat and shaking out an umbrella.  Well, you haven't seen

16  it raining, but by circumstantial evidence you could assume

17  that it is.

18          And another classic one that's given, and it's

19  a nice, quiet picture of a farm house and it has snowed

20  overnight.  And then you look out the window and you see sets

21  of footsteps in the snow going from the house into the barn.

22  Well, you haven't seen anybody in there, but by

23  circumstantial evidence you could deduce that someone went in

24  there.

25          Anybody have a problem to accepting

1 circumstantial evidence as well as direct evidence and then

2 to weigh it in the context of the case?

3                    (No Response)

4          THE COURT:  Thank you.

5               This comes up occasion and I need to ask a

6 question.  Does anyone have a religious or moral conviction

7 that would make it difficult or impossible for you to sit in

8 judgment of another person?

9                    (No Response)

10          THE COURT:  No hands.

11               Let's talk about accomplice testimony.  In this

12 case the United States may call as witnesses alleged

13 accomplices who were named as co-defendants in this

14 indictment.  The United States has entered into plea

15 agreements with one or more of these witnesses.  I will

16 instruct you that plea bargaining is lawful and proper and

17 that the rules of the Court expressly provide for it.

18               Also, plea bargaining is lawful and proper --

19 actually, what I am going to do, I am going to read this to

20 you, okay.  This is right out of what they call the Pattern

21 Jury Charge for the Fifth Circuit.  We all refer to this

22 book.  It's written by the judges.

23               Let me just explain to you the accomplice.

24 This is the exact instruction you will probably be given at

25 the end of the trial.  I think rather than go through my own

1  explanation, it's safer and probably clearer to do it this
2  way.

3          In this case the government will be calling one
4  of its witnesses, an alleged accomplice named as co-defendant
5  in the indictment with whom the government has entered into a
6  a plea agreement.  The agreement provides for various -- and
7  you'll hear exactly what the deal is.  Such plea bargaining,
8  as it is called, has been approved as lawful and proper and
9  expressly provided for in the rules of this Court, an alleged
10 accomplice, including one who has entered into a plea
11 agreement with the government or even sentenced perhaps
12 already in the sister case.

13          Now, those people are not prohibited from
14 testifying.  On the contrary, the testimony of such a witness
15 may alone be of sufficient weight to sustain a verdict of
16 guilty.  You should keep in mind that such testimony is
17 always to be received with caution and weighed with great
18 care.  You should never convict a defendant upon the
19 unsupported testimony of an alleged accomplice unless you
20 believe that testimony beyond a reasonable doubt.

21          The fact that an accomplice has entered into a
22 plea agreement or plea of guilty to the offense charged is
23 not evidence of the guilt of any other person, including the
24 person on trial.

25          Anybody have a problem with that instruction?

1  Anybody here couldn't follow it?

2                    (No Response)

3            THE COURT:  No hands, okay.

4            I think we have discussed this already, but

5   just let me ask again.  And, of course, some of you are in

6   the healthcare profession, and I am going to go down quickly

7   through that and get to you.

8            Just let me see the hands of those of you that

9   are employed in the healthcare profession.  I think we even

10  have one M.D. on the panel.

11           PROSPECTIVE JURORS: (Indicating).

12           THE COURT:  Okay, a number of hands.  We will get to

13  them, make sure we get to them.

14           I tell you what, though, just so the attorneys

15  get the numbers, why don't you just raise your hands.

16           8, 10, 25, 34, 39, okay.  And I am going to go

17  quickly through everybody and go through some of these

18  individual questions when we are through with the general

19  questions.

20           I need a show of hands.  There may be some

21  aspect of this in this case.  And by the way, if you're

22  uncomfortable talking about it, we can talk about it up at

23  the bench later on.

24           Do you have, either you or a relative and/or a

25  close friend been diagnosed or treated for drug or alcohol

1 addiction?  Why don't we get the hands.  16, 20, 32 and 36.

2                   If you would, Ellen, get the numbers and we

3 will call them up later if we need to.

4                   Have you or any member of your family or close

5 friends ever been given anything of value such as money or

6 gift cards in exchange for providing your Medicaid, Medicare

7 number or referring others to receive healthcare services?

8                   No hands.

9                   Have you or any relative and close friend ever

10 been investigated for healthcare fraud?

11                   No hands.

12                   Have you, any relative or close friend ever

13 been victim, to your knowledge, of healthcare fraud?

14                   There are no hands.

15                   I am now going to go down quickly with some

16 individual questions, and then we will just get it underway.

17 By the way, we are going to have opening statements and get

18 right into the testimony today, so it's going to move

19 quickly, and we appreciate your attention.

20                   The first one, we are going to go down quickly,

21 Juror No. 1, stand up, sir.  I see you were an E-3 in the

22 Navy.  That's not Petty Officer First Class.  What is it,

23 Seaman First Class?

24                   PROSPECTIVE JUROR NO. 1:  Yes, sir.

25                   THE COURT:  And what was your MOS?  That's a

1  military specialty.

2           PROSPECTIVE JUROR NO. 1:  Hospital corpsman.

3           THE COURT:  Hospital corpsman, okay.

4                And right now, I see you're in custom crete.

5  Is that concrete?

6           PROSPECTIVE JUROR NO. 1:  Yes, sir.

7           THE COURT:  Have you used your medical training

8  whatsoever outside of the Navy?

9           PROSPECTIVE JUROR NO. 1:  No.

10          THE COURT:  How long were you in the Navy?

11          PROSPECTIVE JUROR NO. 1:  Three-and-a-half years.

12          THE COURT:  Three-and-a-half years, okay.  Thank

13  you.

14               No. 2, security company.  What do you do with

15  the security company?  That's a digital alarm.

16          PROSPECTIVE JUROR NO. 2:  It's commercial alarm,

17  firearm alarm, cameras.

18          THE COURT:  Is your spouse also with the same

19  company?

20          PROSPECTIVE JUROR NO. 2:  Yes.

21          THE COURT:  You have served -- I see you served on a

22  capital murder case, correct, among other things.  Were you

23  the presiding juror on any of those cases?

24          PROSPECTIVE JUROR NO. 2:  No.

25          THE COURT:  You were not.

1          You said, yes, a verdict was reached in those

2    cases?

3          PROSPECTIVE JUROR NO. 2:  One of them was.  One of

4    them pleaded out.

5          THE COURT:  All right.  Thank you.

6          No. 3, risk manager, Stewart Title, correct?

7          PROSPECTIVE JUROR NO. 3:  Correct.

8          THE COURT:  I do note that you have, what is it, a

9    sister-in-law or sister or brother-in-law with the Army Corps

10   of Engineers?

11         PROSPECTIVE JUROR NO. 3:  They're retired.

12         THE COURT:  They're retired, okay.  What did they

13   do, dredging engineering?

14         PROSPECTIVE JUROR NO. 3:  Right.  My twin sister did

15   that, and my brother-in-law was an engineer.

16         THE COURT:  Were they called back for any of this

17   Harvey business?

18         PROSPECTIVE JUROR NO. 3:  No.

19         THE COURT:  All right.  Thank you.  Well, you know,

20   they called a lot of people in to give a hand.

21         No. 4, what do you do at Shell Oil?  I see you

22   have an MBA as well as bachelors degree, and it says oil and

23   gas.  Now, that's pretty broad.

24         PROSPECTIVE JUROR NO. 4:  I'm in our supply

25   organization, and I have responsibility for supplying our

1  facilities in the U.S. with people, electricity and natural
2  gas.
3              THE COURT:  I see you have a sister who is an
4  attorney.
5              PROSPECTIVE JUROR NO. 4:  Yes.
6              THE COURT:  It's in New Orleans?
7              PROSPECTIVE JUROR NO. 4:  In Jefferson Parish.
8              THE COURT:  What sort of work does she do?  Do you
9  know what her specific cases are?
10             PROSPECTIVE JUROR NO. 4:  Well, she doesn't try
11  cases anymore.  She is, I don't know, maybe like --
12             THE COURT:  An administrator?
13             PROSPECTIVE JUROR NO. 4:  Second assistant or
14  something like that.
15             THE COURT:  When she did, what sort of cases did she
16  have?
17             PROSPECTIVE JUROR NO. 4:  Criminal.
18             THE COURT:  Well, that's very good.  It's like they
19  say, you ask an attorney you know, a guy in a balloon.  The
20  guy says, "where am I?"  And the guy that's a lawyer shouts
21  up, "you're up in a balloon."  It's a broad a question as you
22  can get.
23                  To your knowledge has she tried any healthcare
24  fraud cases?
25             PROSPECTIVE JUROR NO. 4:  No.

1           THE COURT:  Have you ever discussed that with her?

2           PROSPECTIVE JUROR NO. 4:  No.

3           THE COURT:  Thank you.

4                No 5, process tech.  What do you do with

5    Liondell?

6           PROSPECTIVE JUROR NO. 5:  Equipment operations,

7    day-to-day operations in a petrochemical company.

8           THE COURT:  Okay.

9                And what subject did your wife teach before she

10   retired?

11          PROSPECTIVE JUROR NO. 5:  Business.

12          THE COURT:  At the high school level?

13          PROSPECTIVE JUROR NO. 5:  She taught some at the

14   college level, too.

15          THE COURT:  All right.  Thank you.

16               No. 6, Centerpoint Energy.  Boy, you are in

17   high demand sometimes, right?

18          PROSPECTIVE JUROR NO. 6:  Yes.

19          THE COURT:  Luckily most of the electricity stayed

20   on.  It was the biggest thing for all of us.  Sorry for

21   anybody who lost electricity.

22               I remember the last time with no electricity.

23   I imagine the folks in Puerto Rico, what did they say, four

24   to six months with no electricity?

25               But you weren't working the poles as an

1 accountant, right?

2          PROSPECTIVE JUROR NO. 6:  No, no, no.  We have a

3 different role.

4          THE COURT:  I see you have a MSA.  Is that a master

5 of science?

6          PROSPECTIVE JUROR NO. 6:  Master of science.

7          THE COURT:  What specifically do you do there?

8          PROSPECTIVE JUROR NO. 6:  Staff accountant.  So it

9 basically is divided into the gas office, natural gas.  I

10 work with the electricity, utilities, electricity, so I know

11 how it's -- I build revenues with the city.

12          THE COURT:  So if mine goes out, can I call you?  We

13 got your phone number there.

14          PROSPECTIVE JUROR NO. 6:  As always, I take --

15          THE COURT:  This is the Judge calling.  When it

16 comes to electricity, get in line, right?

17          PROSPECTIVE JUROR NO. 6:  Yes.

18          THE COURT:  Okay.  I've been there.

19          PROSPECTIVE JUROR NO. 7, corporate auditor.  What's

20 Tailored Brands?

21          PROSPECTIVE JUROR NO. 7:  Mens Wearhouse.

22          THE COURT:  Okay.  And you've been with them six

23 months.  Were you employed outside the home prior to that?

24          PROSPECTIVE JUROR NO. 7:  Yes, I was.

25          THE COURT:  Doing?

1        PROSPECTIVE JUROR NO. 7:  Same corporate audit work.

2        THE COURT:  Corporate audit work.

3            Your brother worked for the IRS; is that

4    correct?

5        PROSPECTIVE JUROR NO. 7:  Six or seven years ago.

6        THE COURT:  What division was he in, do you know?

7        PROSPECTIVE JUROR NO. 7:  No.

8        THE COURT:  Thank you.

9            ██████████████  Texas A&M professor.  You have an

10   MD and a master of public health.  What's specifically do you

11   teach there?

12       PROSPECTIVE JUROR NO. 8:  I teach mainly science

13   journalism, and I coordinate the masters degree program in

14   science and technology journalism, and I also teach medical

15   humanities and medical ethics.

16       THE COURT:  Okay.  And you already discussed with us

17   the public health service.  Thank you.

18            ██████████████  financial planning.  What sort of

19   things do you plan?

20       PROSPECTIVE JUROR NO. 9:  General revenues.

21       THE COURT:  For a company.  It's not --

22       PROSPECTIVE JUROR NO. 9:  Not individual.

23       THE COURT:  Not individual.

24            And you have been with them six years.  Prior

25   to that where were you employed?

1          PROSPECTIVE JUROR NO. 9:  Same type of work.  I
2  worked for a gas company in Florida for about 16 years.
3          THE COURT:  Okay.  Thanks.  Thank you.
4          ███████████  let's see.  We are going to talk
5  to you about -- calling you up later?  No.
6          You are a registered nurse with Ben Taub
7  Hospital, correct?
8          PROSPECTIVE JUROR NO. 10:  Yes.
9          THE COURT:  How long have you been Ben Taub, 15
10  years?
11          PROSPECTIVE JUROR NO. 10:  Yes.  And I have been
12  there for 14 years.
13          THE COURT:  Pardon me?
14          PROSPECTIVE JUROR NO. 10:  I have been at Ben Taub
15  for 14 years.
16          THE COURT:  What sort of specialty?  Do you have a
17  speciality at Ben Taub?
18          PROSPECTIVE JUROR NO. 10:  I --
19          THE COURT:  Wait.  I want to say, this is going to
20  go on during the trial, right?
21          Let me ask you this.  When two people talk at
22  the same time and one is the Judge, Fred, the court reporter,
23  who do you take?
24          THE REPORTER:  I take the Judge down.
25          THE COURT:  There you go.  All right.

1            So nothing you said got on the record, okay.

2            So now if you would tell me what your

3   specialty, if any, is.

4            PROSPECTIVE JUROR NO. 10:  Psychiatry.  I am a

5   psychiatric nurse for everyone.

6            THE COURT:  We all could use a bit of that, I am

7   sure.

8            Anyhow, have you always specialized on the

9   psychiatric service?

10           PROSPECTIVE JUROR NO. 10:  Yes.

11           THE COURT:  Okay.

12           And I see that you have got two children both

13  in the medical field.  One's a dentist and the other is

14  medical student, correct?

15           PROSPECTIVE JUROR NO. 10:  Yes.

16           THE COURT:  Is there anything about this case, since

17  this involves the Medicare system, that prohibits you from

18  being fair and impartial to both sides in this case?

19           PROSPECTIVE JUROR NO. 10:  No.

20           THE COURT:  Without having heard any of the

21  evidence?

22           PROSPECTIVE JUROR NO. 10:  No.

23           THE COURT:  Okay.  Thank you, ma'am.

24           Oh, by the way, I notice that you had a few

25  other items down here for other reasons.  Are you doing okay

1   as far as that goes or do you want to talk to us about it?

2           PROSPECTIVE JUROR NO. 10:  I'm okay.

3           THE COURT:  You're okay:  That's all I needed to

4   know.  Let the record reflect the nurse is okay.

5               Let's see, we have ▮▮▮▮▮▮▮ engineer and EE,

6   correct, electrical engineering, a bachelor and masters.

7               What do you do with -- what is Wind Screen?

8           PROSPECTIVE JUROR NO. 11:  It's a company we

9   bought --

10          THE COURT:  Did you catch that, Fred?

11          THE REPORTER:  Can you repeat that, please.

12          THE COURT:  Repeat it, please.

13          PROSPECTIVE JUROR NO. 11:  Information company.  We

14  provide essential services.

15          THE COURT:  Okay.  I see that you haven't served on

16  an any juries.

17              Okay.  Thank you, sir.

18              No. 12, were you going to be called up later?

19          PROSPECTIVE JUROR NO. 12:  No.

20          THE COURT:  Just remind me.

21              Berkeley Research Group, consultant.  What kind

22  of a constant are you?  If I wanted to consult with you,

23  what's your area of speciality?

24          PROSPECTIVE JUROR NO. 12:  Financial, economic

25  damages systems.

1          THE COURT:  Personal injury?  Can you get to court
2    at all?
3          PROSPECTIVE JUROR NO. 12:  No.  Actually, I have
4    been to this court one time.
5          THE COURT:  Oh, really.  Hold it.  It wasn't in a
6    criminal case, was it?
7          PROSPECTIVE JUROR NO. 12:  No.  I was looking at it.
8          THE COURT:  You were close enough.
9          Is there anything literally about that and
10   your prior experience that would prohibit you from being fair
11   and impartial if you selected as a juror in this case?
12         PROSPECTIVE JUROR NO. 12:  No.
13         THE COURT:  Okay.  Thank you, sir.
14         No. 13, I think we have talked already.  I
15   don't think I have any other questions for you.  Thank you.
16         ███████████      No. 14, you're a teacher, right,
17   HISD.  What subject do you teach, ma'am?
18         PROSPECTIVE JUROR NO. 14:  All of them.
19         THE COURT:  All of them.  So what grade?
20         PROSPECTIVE JUROR NO. 14:  Kindergarten.
21         THE COURT:  All right.  Teach where you can, right?
22         You have been with HISD for 18 years.  Have you
23   always been in the kindergarten school area?
24         PROSPECTIVE JUROR NO. 14:  Yes.  Second grade for
25   two years.

1          THE COURT:  Second grade for two years.

2               I don't see anything else.  Thank you.

3               ███████████  you are with Ororana,

4     O-r-o-r-a-n-a.  You're in what, sales procurement?  What kind

5     of a company is that?

6          PROSPECTIVE JUROR NO. 15:  We're a packaging

7     company.  Whatever you can put in a box, we make and sell to

8     you.

9          THE COURT:  Well, anything.  That's pretty broad.

10         PROSPECTIVE JUROR NO. 15:  Yes, it is.

11         THE COURT:  I am going to tell a story about being a

12    general consultant.  I will tell you that in a minute.

13              Do you make the boxes and sell them?

14         PROSPECTIVE JUROR NO. 15:  We have a manufacturing

15    franchise in California, not here in Texas.

16         THE COURT:  Home in California.  And you have been

17    with them three years.

18              Prior to that where were you?

19         PROSPECTIVE JUROR NO. 15:  I was initiating sales

20    and then came back to this.

21         THE COURT:  Okay.  Thank you.  Thank you.

22              The reason why I am talking about a consultant,

23    when I went to school, I was in engineering school for a

24    year-and-a-half and I almost flunked out.  Actually, I

25    probably did.  Well, you know, two and two have to equal four

1   or the bridge will fall down.

2           I found out that if you go to pre-law and maybe
3   law school you could argue to some judge two and two equal
4   five and maybe you get away with that, so I figured I'm going
5   to switch over there.

6           But I had a friend of mine, the first year of
7   engineering, okay, his name was Kenny Frank, I still remember
8   him, graduated in 1961 undergraduate school; and he came and
9   he had a business card since the first day of engineering
10  school.  And so what did it say?  It said "general
11  consultant."

12          I asked him, I said, you're dealing with some
13  wise blank from New York where I grew up.  I said, Kenny, I
14  said, what do you consult about?

15          He said, I'm a general consultant.

16          What does that mean?

17          He says, you want to consult with me about
18  anything, I'd be glad to do it.

19          It really happened.  They say truth is stranger
20  than fiction.

21          I am going to keep moving.  That's why it's so
22  much fun doing this for a living.

23          Texas First Bank, that's ████████████

24      PROSPECTIVE JUROR NO. 16:  Yes, sir.

25      THE COURT:  What do you do there?  It says banking

1  specifically.  What do you do, sir?

2          PROSPECTIVE JUROR NO. 16:  Commercial lending.

3          THE COURT:  Commercial lending.

4              Have you been -- and for 45 years.  Have you

5  been in that division most of the time?

6          PROSPECTIVE JUROR NO. 16:  No.  Five years there and

7  38 in operations.

8          THE COURT:  Of the bank?

9          PROSPECTIVE JUROR NO. 16:  Yes.  Two different

10 banks.

11         THE COURT:  Two different banks.

12             Where were you before the Texas First Bank?

13         PROSPECTIVE JUROR NO. 16:  First for Citizens Bank

14 and then Compass Bank.

15         THE COURT:  And I see your spouse is employed at

16 Habitat for Humanity?

17         PROSPECTIVE JUROR NO. 16:  Yes, sir.

18         THE COURT:  I guess they have a lot of charity work

19 going on now?

20         PROSPECTIVE JUROR NO. 16:  Oh, yes.

21         THE COURT:  Almost unbelievable.

22             I understand that, looking down here, that you

23 did serve on a jury and you did reach a verdict, correct?

24         PROSPECTIVE JUROR NO. 16:  Yes.

25         THE COURT:  Okay.  Thank you, sir.

1               ▮▮▮▮▮▮▮▮▮▮▮ you are retired?

2          PROSPECTIVE JUROR NO. 17:  Yes, sir.

3          THE COURT:  Did you work outside the home before you

4     retired?

5          PROSPECTIVE JUROR NO. 17:  Yes.

6          THE COURT:  What did you do at that time, ma'am?

7          PROSPECTIVE JUROR NO. 17:  I worked for the City of

8     Houston in the legal department.

9          THE COURT:  Legal department, okay.  Which

10    department?

11         PROSPECTIVE JUROR NO. 17:  Legal.

12         THE COURT:  I know.  Any subdivision of it or --

13         PROSPECTIVE JUROR NO. 17:  I basically worked for

14    the City Attorney.

15         THE COURT:  The City Attorney himself or herself?

16         PROSPECTIVE JUROR NO. 17:  Him, yes.

17         THE COURT:  Were you administrative assistant so to

18    speak to the City Attorney?

19         PROSPECTIVE JUROR NO. 17:  Yes.

20         THE COURT:  Do you have any legal training?  I mean,

21    aside from all the years there?

22         PROSPECTIVE JUROR NO. 17:  Other than that, no, sir.

23         THE COURT:  That's plenty.  That's plenty.  You

24    probably know every bone that is buried.

25         PROSPECTIVE JUROR NO. 17:  Oh, no.

1        THE COURT:  That's right.  Oh, no.  I can vouch for

2   that, the people that work for me in that same capacity.

3        PROSPECTIVE JUROR NO. 17:  Uh-huh.

4        THE COURT:  But is there anything about this case,

5   having been exposed to the legal system for so many years,

6   that you feel you couldn't sit as a fair juror in this case?

7        PROSPECTIVE JUROR NO. 17:  No.

8        THE COURT:  Thank you so much.

9        ███████████ you are a principal in Klein; is

10  that correct?

11       PROSPECTIVE JUROR NO. 18:  Yes, sir.

12       THE COURT:  Before that, what subject did you teach?

13       PROSPECTIVE JUROR NO. 18:  Nine or ten years that I

14  taught anatomy.

15       THE COURT:  Are you a principal in a high school or

16  elementary school?

17       PROSPECTIVE JUROR NO. 18:  Both currently.  I am in

18  a brand new high school that just opened this year, and so we

19  only had ninth and tenth graders.  Our building was full, and

20  one of elementary schools in our district lost their entire

21  building in a flood, so I now have an entire elementary

22  school and a high school in my building.

23       THE COURT:  I see.  Now, your husband, I believe, is

24  a police officer, correct?

25       PROSPECTIVE JUROR NO. 18:  Yes.

1        THE COURT:  And that's for six-and-a-half years with

2    the City of Tomball?

3        PROSPECTIVE JUROR NO. 18:  Yes, sir.

4        THE COURT:  Now, you are going to be hearing from

5    law enforcement officers.  Let me just ask you specifically,

6    have you talked about your husband's business with him, I

7    mean, as to what he does?

8        PROSPECTIVE JUROR NO. 18" Yes.

9        THE COURT:  What division is he assigned to?

10       PROSPECTIVE JUROR NO. 18:  He's on parole, but he's

11    also the only canine officer in the City of Tomball.

12       THE COURT:  Now, only you know about your answer to

13    this.  I will just ask you.  I know didn't raise your hand

14    before.  Knowing that and having a spouse who is a police

15    officer, is there anything about this case that you think

16    would prohibit you from being fair and impartial and giving

17    both sides an equal start?

18       PROSPECTIVE JUROR NO. 18:  No, sir.

19       THE COURT:  All right.  Thank you very much.

20            It may be just me.  I am asking someone who has

21    been with me 22 years.  Is it warm in here?

22       CASE MANAGER:  Yes.

23       THE COURT:  Can we turn it down then?

24            By the way, I've learned a long time ago, you

25    see in that corner there, that thermostat, that's a fake.

 1 No, really everything is done by computer.  Ellen has got to

 2 call down there, give the number of this courtroom, and then

 3 maybe they will turn it down.

 4             Let's see.   ██████████   No 20.  What is

 5 Newport Exploration?  I know it's oil and gas.  What

 6 specifically, are you downhole or are you pipeline?

 7             PROSPECTIVE JUROR NO. 20:  Downhole.

 8             THE COURT:  Whereabout?  Do you do drilling then?

 9             PROSPECTIVE JUROR NO. 20:  Yes.

10             THE COURT:  Whereabout?

11             PROSPECTIVE JUROR NO. 20:  I work in Utah.

12             THE COURT:  Pardon me?

13             PROSPECTIVE JUROR NO. 20:  I work Utah properties.

14             THE COURT:  Utah.  They have what, oil and gas out

15 there?

16             PROSPECTIVE JUROR NO. 20:  Yes.

17             THE COURT:  Yes?

18             PROSPECTIVE JUROR NO. 20:  Yes.

19             THE COURT:  Both?

20             PROSPECTIVE JUROR NO. 20:  Both, yes.  Mostly oil.

21             THE COURT:  Mostly oil.

22             This looks super.  I see your spouse is

23 employed by God's Garage -- that's what it says -- a

24 nonprofit program.  What exactly?  I am sure it's a wonderful

25 group.

PROSPECTIVE JUROR NO. 20: We repair cars for single moms and give cars away for single moms and widows for free.

THE COURT: That's super. That's really super. Thank you.

(Applause)

THE COURT: [redacted] you will be coming to talk to us later, so we can move along.

No. 21, you're retired. What did you do prior to retiring, sir?

PROSPECTIVE JUROR NO. 21: I was in oil and gas marketing for DCP Midstream.

THE COURT: Okay, midstream. What exactly did you do?

PROSPECTIVE JUROR NO. 21: I did several positions there starting with software conversion. I was in natural gas supply.

THE COURT: Did you work for the Texas City Police Department at one time?

PROSPECTIVE JUROR NO. 21: Austin Police Department.

THE COURT: Austin City, there it is, police department.

What division were you assigned to?

PROSPECTIVE JUROR NO. 21: I was a uniformed patrolman.

THE COURT: Uniformed patrolman.

1          Did you have any contact or any matter with --
2  oh, there is it is.  We lose these over time, we really do.
3          Have we got, ever got the other one replaced
4  yet, Ellen?
5          CASE MANAGER:  We did.
6          THE COURT:  We did, okay.  I am not going to take
7  the rap for this one.  Right back on.
8          Any interaction with any kind of healthcare
9  fraud?
10          PROSPECTIVE JUROR NO. 21:  No, I didn't.
11          THE COURT:  Also, I see that you sat on a civil case
12  and on a criminal case, correct?
13          PROSPECTIVE JUROR NO. 21:  Yes.
14          THE COURT:  Anything about -- on those cases,
15  without what happened, did you reach a verdict in all of
16  those cases?
17          PROSPECTIVE JUROR NO. 21:   In the civil case we did;
18  the criminal case we did not.
19          THE COURT:  Were you the presiding juror in any of
20  those cases?
21          PROSPECTIVE JUROR NO. 21:  Neither.
22          THE COURT:  And being a former police officer,
23  anything about this case do you feel you, will you be able to
24  give both sides an equal shot at it?
25          PROSPECTIVE JUROR NO. 21:  Yes, sir.

1          THE COURT:  Okay.  Thank you.

2          ███████████  Anadarko, a geoscience tech.  You

3   got an associate in science degree.  What do you do exactly,

4   ma'am?

5          PROSPECTIVE JUROR NO. 22:  I am retired now.

6          THE COURT:  When you were with geoscience or you

7   did geoscience work, what does that mean?

8          PROSPECTIVE JUROR NO. 22:  We did maps, we did

9   research.

10          THE COURT:  Now, you went to SUNY, State University

11   of New York.  What division?

12          PROSPECTIVE JUROR NO. 22:  Public school.

13          THE COURT:  I was looking at it.  It didn't look

14   like Catskill.  What is it?

15          PROSPECTIVE JUROR NO. 22:  Cobleskill.

16          THE COURT:  Where is that?

17          PROSPECTIVE JUROR NO. 22:  Kind of near Baseball

18   Hall of Fame, that area.

19          THE COURT:  Up there in -- that's Cooperstown?

20          PROSPECTIVE JUROR NO. 22:  Near Cooperstown.

21          THE COURT:  ███████████

22          PROSPECTIVE JUROR NO. 23:  Yes.

23          THE COURT:  It says that you're retired.  What, sir,

24   did you do outside the home when you were working?

25          PROSPECTIVE JUROR NO. 23:  I worked as a refinery

1 mechanic.

2        THE COURT:  As a refinery mechanic.  How many years?

3        PROSPECTIVE JUROR NO. 23:  35.

4        THE COURT:  Which units, around here?

5        PROSPECTIVE JUROR NO. 23:  The one in Pasadena.

6        THE COURT:  In Pasadena, okay.

7          I see that you served on a civil case and a

8 verdict was reached, correct?

9        PROSPECTIVE JUROR NO. 23:  Yes.

10        THE COURT:         No. 24, Federal Express.  I

11 guess you have a lot of business these days, right?

12        PROSPECTIVE JUROR NO. 24:  Yes.

13        THE COURT:  In logistics.  What do you do in

14 logistics?

15        PROSPECTIVE JUROR NO. 24:  I manage on the routes.

16 They have contracts with different sections of the city and I

17 have --

18        THE COURT:  You subcontract?

19        PROSPECTIVE JUROR NO. 24:  They subcontract.

20        THE COURT:  Okay.

21          I see you have a finance degree from U of H

22 Thank you.

23                   are we going to call you later or

24 not?

25        PROSPECTIVE JUROR NO. 25:  No.

1          THE COURT:  You are Texas A&M.  I see you have

2    journalism, Spanish as an undergraduate and horticulture and

3    international agriculture as a masters degree, correct?

4          PROSPECTIVE JUROR NO. 25:  Yes.

5          THE COURT:  Where do you either teach or what is

6    your staff position at Texas A&M?

7          PROSPECTIVE JUROR NO. 25:  I work for the college,

8    but I coordinate different programs, and then I also teach a

9    course in culture.

10          THE COURT:  And you teach what course?

11          PROSPECTIVE JUROR NO. 25:  A course on culture.

12          THE COURT:  On horticulture or culture?

13          PROSPECTIVE JUROR NO. 25:  Culture.  On what culture

14    is and how you use that knowledge.

15          THE COURT:  I see.  What department are you assigned

16    to?

17          PROSPECTIVE JUROR NO. 25:  Technically as Leadership

18    Education Communication.

19          THE COURT:  Here it is.  Thank you.

20          PROSPECTIVE JUROR NO. 25:  Three different offices.

21          THE COURT:  I see that you did serve on a robbery

22    case, correct?

23          PROSPECTIVE JUROR NO. 25:  Yeah.

24          THE COURT:  I just need it.  It was not circled

25    here.

1              Did you reach a verdict in this case, yes or

2    no?

3              PROSPECTIVE JUROR NO. 25:  Yes.

4              THE COURT:  Thank you so much.  Were you the

5    presiding juror?

6              PROSPECTIVE JUROR NO. 25:  No.

7              THE COURT:  The foreman of the jury.  Okay.

8              ██████████████ I see you're an attorney.  We

9    talked about the National Security Agency.

10             I see you did serve on a grand jury, correct,

11   in Harris County?

12             PROSPECTIVE JUROR NO. 26:  Yes.

13             THE COURT:  In the 1990s, anything about that -- so

14   you understand the system, and you're an attorney.  Is there

15   anything about that that would give you cause not to be fair

16   and impartial in this case?

17             PROSPECTIVE JUROR NO. 26:  No, sir.

18             THE COURT:  Thank you, ma'am.

19             ████████████ There is our structural engineer.

20   I know we had one.  That was the best description I had.

21   Still there.  It's still there.

22             I see that your spouse is a licensed

23   professional counselor.  What sort of thing does she do?

24             PROSPECTIVE JUROR NO. 27:  She works for some

25   schools in the Katy area.

1          THE COURT:  Mostly youngsters in high school?

2          PROSPECTIVE JUROR NO. 27:  Yes, sir.

3          THE COURT:  Elementary?

4          PROSPECTIVE JUROR NO. 27:  Elementary, yeah, like

5    first and second grade.

6          THE COURT:  Okay.  All right.  Thank you.

7          ██████████████  were you coming up later?

8          PROSPECTIVE JUROR NO. 28:  No.

9          THE COURT:  Let me put it this way.  If I call on

10   you and you're going to be called up later, let me know, so

11   we will talk up there.

12          And you're an education administrator, correct?

13          PROSPECTIVE JUROR NO. 28:  Yes.

14          THE COURT:  Were you ever a classroom teacher?

15          PROSPECTIVE JUROR NO. 28:  For more than 20 years.

16          THE COURT:  20 years.  What was your subject?

17          PROSPECTIVE JUROR NO. 28:  Social studies and

18   reading mostly.  It was elementary school.

19          THE COURT:  Elementary school.

20          PROSPECTIVE JUROR NO. 28:  Mostly fifth grade.

21          THE COURT:  Pardon me?

22          PROSPECTIVE JUROR NO. 28:  Mostly fifth grade.

23          THE COURT:  Okay.  Thank you.

24          ██████████████  massage therapist, correct?

25          PROSPECTIVE JUROR NO. 29:  I just graduated.

1        THE COURT:  That's a pretty good degree you have

2    these days, isn't it?  It really is.  It's a tough school to

3    get into, aren't they, joking aside?

4        PROSPECTIVE JUROR NO. 29:  Yeah.  You have to go

5    through an interview process.

6        THE COURT:  How long a course of study is it?

7        PROSPECTIVE JUROR NO. 29:  It's six months, and then

8    you have to take exams.  And then if you go to a specialty,

9    you have to continue on with that.

10        THE COURT:  Do you have a specialty?

11        PROSPECTIVE JUROR NO. 29:  Medical sports massage.

12        THE COURT:  And so you are not employed outside the

13   home at this time?

14        PROSPECTIVE JUROR NO. 29:  No, not at this time.

15        THE COURT:  When did you graduate?

16        PROSPECTIVE JUROR NO. 29:  It's been a few months,

17   but I am like right about to take a final, big test, so I am

18   in this weird juxtaposition.

19        THE COURT:  Well, when it comes to weird, I won't go

20   there, not with you.

21             You can say, when it comes to weird, you're

22   looking at them, right?

23             Okay.  Thank you, ma'am.  Thank you very much.

24             Now, what's so funny, █████████████

25             Let's see, what you did for a living is

administrative assistant.  What is TCP Group, please?

PROSPECTIVE JUROR NO. 30:  Chemical plant.

THE COURT:  Chemical plant, okay.  What sort of chemicals do you work with?

PROSPECTIVE JUROR NO. 30:  Wow.  C4s and resinates and hydrocarbons.

THE COURT:  Hydrocarbons I understand.  It has something to do with it.

PROSPECTIVE JUROR NO. 30:  Right.  I pay the operators to go and do the work.

THE COURT:  Very good.

Let's see, you have a son that is active duty in the Navy, is a naval flight officer?

PROSPECTIVE JUROR NO. 30:  Yes.

THE COURT:  So he's on duty now?

PROSPECTIVE JUROR NO. 30:  Yes.

THE COURT:  What's his rank now, junior grade or a lieutenant?

PROSPECTIVE JUROR NO. 30:  He's a lieutenant junior grade.

THE COURT:  Lieutenant junior grade.  That's the equivalent of a first lieutenant in the other services. Thank you.

PROSPECTIVE JUROR NO. 31:  Yes, sir.

1          THE COURT:  You are an attorney?

2          PROSPECTIVE JUROR NO. 31:  Yes, sir.

3          THE COURT:  And you are with the Museum of Fine

4    Arts, Houston.  What do you do with them?

5          PROSPECTIVE JUROR NO. 31:  Heavily transactional,

6    and help counsel work.  So I write the contracts for

7    acquisition of art exhibitions, art loans and the like.

8          THE COURT:  How many attorneys do they have on

9    staff?  You're it?

10         PROSPECTIVE JUROR NO. 31:  Yes, I am.

11         THE COURT:  How big a staff do you have?

12         PROSPECTIVE JUROR NO. 31:  You're looking at it.

13         THE COURT:  Okay.

14             I see a former husband is an attorney?

15         PROSPECTIVE JUROR NO. 31:  Yes, Judge.

16         THE COURT:  Baker Hughes.  What division is he?

17   What's his specialty?

18         PROSPECTIVE JUROR NO. 31:  Real estate.

19         THE COURT:  Real estate law.

20             Again, being an attorney, anything about what I

21   have said that would prohibit you from being fair and

22   impartial in this case?

23         PROSPECTIVE JUROR NO. 31:  No.

24             May I be excused to the ladies room?

25         THE COURT:  Yes, ma'am.  We will take a short break,

by the way.  I am almost done.  I will call a few people up
there; and during that time if you need to take a short
break, you can and then we are going to wrap it up.  So it
will move quickly after this.  It's true, it will move
quickly.

By the way, by the way, kidding aside, a voir
dire like this in state court sometimes can take a day or
two, if you've been on them.  I am doing it myself.  We are
moving along.

And, by the way, I was in on the drafting up of
these questionnaires.  It's the most comprehensive
questionnaire of any federal court in the United States.  I
tried case in federal courts in Phoenix, Arizona up to New
York City.  Nothing compares to this where we can move it
along.

Okay.  ████████  certified public accountant.

CASE MANAGER:  Judge, we are calling him up later.
Thank you.

THE COURT:  I see you served as an Army First
Lieutenant, infantry.

PROSPECTIVE JUROR NO. 32:  Yes, Your Honor.

THE COURT:  All right.  I outranked you by one
grade.

Let me ask you, did you go to Fort Benning?

PROSPECTIVE JUROR NO. 32:  Yes, Your Honor.

1          THE COURT:  So infantry officer basic school?

2          PROSPECTIVE JUROR NO. 32:  Yes, Your Honor.

3          THE COURT:  Did you end up going to jump school?

4          PROSPECTIVE JUROR NO. 32:  Yes, Your Honor.

5          THE COURT:  All right.  So we're both airborne,

6  right?

7               You know what they say about paratroopers in

8  jump school?  The first six weeks they separated the men from

9  the boys, the next week they separate the boys from the

10  idiots, and the third week the idiots jumped, right?

11               All right.  Have a seat.

12               I'm not jumping out of planes anymore either.

13               Let's see,        is it?  That's Juror No.

14  34 -- oh, 33.  I skipped one page.  Sorry.  Ah, you can't get

15  away.

16               Yes, ma'am.  Stand up.  We are going to talk to

17  you.

18               Administrative assistant for Enterprise

19  Products.  What sort of a company is that, ma'am?

20          PROSPECTIVE JUROR NO. 33:  Mainstream energy

21  company.

22          THE COURT:  What is your position specifically?

23          PROSPECTIVE JUROR NO. 33:  I'm in the Treasury

24  Department.

25          THE COURT:  In the Treasury Department.

1          You did serve on one jury, looks like county

2     court, right, a misdemeanor court.  Was a verdict reached in

3     that case?

4          PROSPECTIVE JUROR NO. 33:  Yes.

5          THE COURT:  Were you the foreman of the jury?

6          PROSPECTIVE JUROR NO. 33:  No, sir.

7          THE COURT:  Thank you.

8          ▓▓▓▓▓▓▓▓  you're a nurse, correct?

9          PROSPECTIVE JUROR NO. 34:  Yes, sir.

10         THE COURT:  At Memorial Hermann?

11         PROSPECTIVE JUROR NO. 34:  Yes.

12         THE COURT:  What is your specialty?

13         PROSPECTIVE JUROR NO. 34:  Intensive care.

14         THE COURT:  What sort of the intensive care?

15         PROSPECTIVE JUROR NO. 34:  Medical ICU.

16         THE COURT:  Medical ICU.

17         You ever deal with any Medicare or Medicaid

18    problems?

19         PROSPECTIVE JUROR NO.  34:  I deal with overdoses.

20         THE COURT:  Deal with overdoses, okay.

21         What sort of work did you do with overdose

22    patients?

23         PROSPECTIVE JUROR NO. 34:  I am a charge nurse and a

24    family care nurse.

25         THE COURT:  Primary care nurse.

1          Have you dealt with people with drug and

2  alcohol problems?

3          PROSPECTIVE JUROR NO. 34:  Yes.

4          THE COURT:  Pardon me?

5          PROSPECTIVE JUROR NO. 34:  Yes, sir, all the time.

6          THE COURT:  Is there anything about this since this

7  may be somewhat of an issue here -- and I don't know.  It was

8  one of the questions the attorneys wanted me to ask.  Would

9  that influence you one way or another to be fair and

10  impartial to both sides?  Are you having a concern?

11          PROSPECTIVE JUROR NO. 34:  Yes, sir.

12          THE COURT:  Hold it.  No. 34, got you.  We will call

13  you later.  We got to get a few folks up front, right?

14          Thank you so much.

15          ▉▉▉▉▉▉▉▉ No. 35, you're a legal assistant,

16  correct?

17          PROSPECTIVE JUROR NO. 35:  That's correct.

18          THE COURT:  That blank, though, who is the employer

19  that you work for?

20          PROSPECTIVE JUROR NO. 35:  Department of Treasury.

21          THE COURT:  What is it?

22          PROSPECTIVE JUROR NO. 35:  Department of Treasury.

23          THE COURT:  Department of the Treasury of the United

24  States?

25          PROSPECTIVE JUROR NO. 35:  Yes.

1          THE COURT:  Where is your office, downtown here

2     somewhere?

3          PROSPECTIVE JUROR NO. 35:  No.  59 and South

4     Gessner.

5          THE COURT:  59 and South Gessner?

6          PROSPECTIVE JUROR NO. 35:  Gessner.

7          THE COURT:  What exactly do you do?

8          PROSPECTIVE JUROR NO. 35:  I'm a legal assistant for

9     three attorneys dealing in tax law.

10          THE COURT:  Tax law.  Anything to do with Medicare,

11     Medicaid, anything like that?

12          PROSPECTIVE JUROR NO. 35:  No, sir.

13          THE COURT:  Okay.  Thank you.

14          ███████████████ county court at law.  Is that

15     misdemeanor court?

16          PROSPECTIVE JUROR NO. 36:  Yes.

17          THE COURT:  You also do, I know in the counties they

18     have courts at law.  Do you also do civil work?

19          PROSPECTIVE JUROR NO. 36:  Yes.

20          THE COURT:  Because in the bigger counties like we

21     have in the misdemeanor level courts, they're known as the

22     county courts at law; and in the bigger counties they have

23     special civil county courts of law and criminal county courts

24     at law other than when you do them both.

25               How long have you been there?

1        PROSPECTIVE JUROR NO. 36:  I've been in that
2   position since three years.
3        THE COURT:  For three years.
4           Were you working prior to that?  I see you have
5   been with Walker County for a total of eight years.
6        PROSPECTIVE JUROR NO. 36:  Yes.  I worked for a
7   state district judge.
8        THE COURT:  State district judge.
9        PROSPECTIVE JUROR NO. 36:  Yes.
10       THE COURT:  Who was that?
11       PROSPECTIVE JUROR NO. 36:  Ken Keeling.
12       THE COURT:  I know the name.
13       PROSPECTIVE JUROR NO. 36:  He passed away.
14       THE COURT:  I know the name from Harris County.
15       PROSPECTIVE JUROR NO. 36:  Well, he was on that
16  bench.
17       THE COURT:  Oh, okay.
18          Anything about this prohibit you from being
19  fair and impartial?  Do you have a concern?
20       PROSPECTIVE JUROR NO. 36:  (Indicating in the
21  affirmative).
22       THE COURT:  We will call the lady up in a moment.
23          ██████████  State Rhodes School.  What kind of
24  a school is that?
25       PROSPECTIVE JUROR NO. 37:  It's a small country

 1  school.

 2          THE COURT:  Whereabout?

 3          PROSPECTIVE JUROR NO. 37:  In Schulenburg, Texas.

 4          THE COURT:  How many students?

 5          PROSPECTIVE JUROR NO. 37:  165.

 6          THE COURT:  What grades, all grades?

 7          PROSPECTIVE JUROR NO. 37:  3-K through 8th grade.

 8          THE COURT:  Pre-K through eighth grade?

 9          PROSPECTIVE JUROR NO. 37:  3-K, three year olds,

10  like early child.

11          THE COURT:  Oh, really.  Wow.

12          PROSPECTIVE JUROR NO. 37:  Through eighth grade.

13          THE COURT:  A secretary, just general secretary for

14  the school?

15          PROSPECTIVE JUROR NO. 37:  I do everything but teach

16  and cook.

17          THE COURT:  It says here you have a husband police

18  who is a police officer, correct?

19          PROSPECTIVE JUROR NO. 37:  Yes.

20          THE COURT:  What division is he assigned to?

21          PROSPECTIVE JUROR NO. 37:  Now he is a sergeant.

22          THE COURT:  He's a sergeant.

23          PROSPECTIVE JUROR NO. 37:  On patrol in Weimer.

24          THE COURT:  And any particular division?  Do they

25  have major divisions there?  Is he general patrol?

1      PROSPECTIVE JUROR NO. 37:  There is no patrol.

2      THE COURT:  Have you talked about his business?  I

3  am sure you have from time to time, or not much?

4      PROSPECTIVE JUROR NO. 37:  Not much.

5      THE COURT:  Okay.  Well, of course, we are going to

6  have some police officers on the stand here.

7              Anything about that prohibit you from being

8  fair and impartial in this case without having heard any of

9  the evidence?

10      PROSPECTIVE JUROR NO. 37:  No.

11      THE COURT:  Thank you.

12          38, ███████████

13      PROSPECTIVE JUROR NO. 38:  Yes, sir.

14      THE COURT:  Spelled correctly, okay.

15          Chris' Car, what is it?

16      PROSPECTIVE JUROR NO. 38:  Chris' Car Doc.

17      THE COURT:  Car Doc, in the office.  What does

18  Chris' Car Doc do?

19      PROSPECTIVE JUROR NO. 38:  We are a, mainly a

20  performance shop, but we also do general mechanic.

21      THE COURT:  And what city is it in?

22      PROSPECTIVE JUROR NO. 38:  Humble.

23      THE COURT:  And you work in the office?

24      PROSPECTIVE JUROR NO. 38:  Yes, sir.

25      THE COURT:  I see that you were on, it looks like a

```
 1  murder trial at one time, correct?  Anything about that you
 2  think would prohibit you from being fair and impartial in
 3  this case?
 4              PROSPECTIVE JUROR NO. 38:  No, sir.
 5              THE COURT:  Okay.  Were you the presiding juror?
 6              PROSPECTIVE JUROR NO. 38:  Yes, sir.
 7              THE COURT:  Okay.  Thank you.
 8              ██████████████ executive assistant McKesson.  Is
 9  that the drug company?
10              PROSPECTIVE JUROR NO. 39:  Healthcare.
11              THE COURT:  What sort of healthcare do you do?
12              PROSPECTIVE JUROR NO. 39:  We do everything.
13  McKesson has a bunch of different divisions.
14              THE COURT:  Like what?
15              PROSPECTIVE JUROR NO. 39:  To especially help with
16  cancer patients.
17              THE COURT:  Is that your area?
18              PROSPECTIVE JUROR NO. 39:  That is.  I work for the
19  CFO of that division.
20              THE COURT:  You do what?
21              PROSPECTIVE JUROR NO. 39:  I work for the CFO of
22  that division.
23              THE COURT:  Okay, of that division?
24              PROSPECTIVE JUROR NO. 39:  Yes.
25              THE COURT:  Do you have any interaction with the
```

1  government agencies?

2        PROSPECTIVE JUROR NO. 39:  No.

3        THE COURT:  No.  None whatsoever?

4        PROSPECTIVE JUROR NO. 39:  I think we have -- we

5  prefer our positions, but my division I do not.

6        THE COURT:  So no.

7             Have you had any kind of interaction at all

8  with Medicare, Medicaid and Medicaid fraud?

9        PROSPECTIVE JUROR NO. 39:  I do process Medicare.

10  My CFO signs off on contracts with the government or drug

11  licenses, things like that, but I don't deal with them for

12  anything else.

13        THE COURT:  Anything about this case you have

14  concern about being fair?

15        PROSPECTIVE JUROR NO. 39:  No.

16        THE COURT:  Okay, thanks.

17                    ███████████

18        PROSPECTIVE JUROR NO. 40:  ████████  correct.

19        THE COURT:  You are not being called up later, are

20  you?

21        PROSPECTIVE JUROR NO. 40:  No.

22        THE COURT:  Okay.  Not yet anyhow.

23             We will see.  You want to get called up there?

24  It's not bad.

25        PROSPECTIVE JUROR NO. 40:  No.

1          THE COURT:  It's not bad.

2               Contract administrator.  What do you do, ma'am?

3          PROSPECTIVE JUROR NO. 40:  I handle all of the

4   master service agreements, and I do all of the housing

5   quotes, deal with the insurance.

6          THE COURT:  And deal with the insurance, okay.

7               Any health insurance at all?

8          PROSPECTIVE JUROR NO. 40:  No.

9          THE COURT:  Okay, thanks.

10              ███████████████

11         PROSPECTIVE JUROR NO. 41:  Yes.

12         THE COURT:  The Kingwood post office.  Is that the

13  U.S. Postal Service?

14         PROSPECTIVE JUROR NO. 41:  Yes, sir.

15         THE COURT:  And for 24 years?

16         PROSPECTIVE JUROR NO. 41:  Yes, sir.

17         THE COURT:  What's your route these days?

18         PROSPECTIVE JUROR NO. 41:  Supporting 44Ks five days

19  a week in Kingwood.

20         THE COURT:  In Kingwood.  In other words, parts of

21  Kingwood?

22         PROSPECTIVE JUROR NO. 41:  Right beside the U.S.

23  post office.

24         THE COURT:  Did you do okay in the flood or you had

25  concerns?

1          PROSPECTIVE JUROR NO. 41:  Minor stuff.

2          THE COURT:  Okay.  In any event, thank you.  I guess

3  you really know that neighborhood well servicing it so many

4  years.

5          ███████████████  Sequent Energy Management.  What

6  is that, please?

7          PROSPECTIVE JUROR NO. 42:  Natural gas.

8          THE COURT:  Natural gas.  And you're an analyst,

9  okay.

10          You have a BBA from University of Kentucky,

11  correct?  How did you get down to Texas?

12          PROSPECTIVE JUROR NO. 42:  They moved most of us

13  down here.  There was a division up there, and they moved us

14  all down to Houston.

15          THE COURT:  How many years ago?

16          PROSPECTIVE JUROR NO. 42:  About nine.

17          THE COURT:  And you have been with them nine years?

18          PROSPECTIVE JUROR NO. 42:  10.  I think I have been

19  down here for 10 years.

20          THE COURT:  Okay.  Thank you.

21          ███████████  let's see.  You're a what,

22  designer, structural designer?  Are you self-employed?

23          PROSPECTIVE JUROR NO. 43:  I am unemployed right

24  now.

25          THE COURT:  Unemployed right now.

1           Prior to that, who were you employed by, sir?

2           PROSPECTIVE JUROR NO. 43:  Pressman.

3           THE COURT:  What is it?

4           PROSPECTIVE JUROR NO. 43:  Pressman.

5           THE COURT:  And what did you do with them?

6           PROSPECTIVE JUROR NO. 43:  I did structural design

7  for offshore platforms.

8           THE COURT:  Offshore platforms, okay.  All right.

9  Thank you.

10          ███████████

11          PROSPECTIVE JUROR NO. 44:  Yes.

12          THE COURT:  What is JLL?

13          PROSPECTIVE JUROR NO. 44:  It's a commercial

14  property management firm.

15          THE COURT:  And management, what do you do?

16          PROSPECTIVE JUROR NO. 44:  I manage Texas Childrens

17  Hospital.

18          THE COURT:  My goodness.  Do you supervise that

19  whole building?  How does that work?

20          PROSPECTIVE JUROR NO. 44:  So you would call it

21  engineering.

22          THE COURT:  We got a job for you if it doesn't work.

23          I see you majored in psychology, correct?

24          PROSPECTIVE JUROR NO. 44:  Yes, sir.

25          THE COURT:  What is National University?

1          PROSPECTIVE JUROR NO. 44:  It's a college, a
2     military college out in California.
3          THE COURT:  And you got an HR certification,
4     masters?
5          PROSPECTIVE JUROR NO. 44:  Uh-huh.
6          THE COURT:  Of what, human resources?
7          PROSPECTIVE JUROR NO. 44:  Yes.
8          THE COURT:  Is that basically you do human resources
9     in your company?
10          PROSPECTIVE JUROR NO. 44:  Human resources is
11     everywhere.
12          THE COURT:  Yeah, right.
13               Okay.  Thank you, ma'am.
14               █████████  what is Grant Thornton, please?  And
15     you're a consultant?
16          PROSPECTIVE JUROR NO. 45:  Yeah.
17          THE COURT:  It says consultant.  All right.
18          PROSPECTIVE JUROR NO. 45:  Grant Thornton is an
19     accounting firm.  I'm a valuation expert with a specialty in
20     real estate.
21          THE COURT:  Do you do anything relative to the
22     storm, the storm damage, anything like that?
23          PROSPECTIVE JUROR NO. 45:  No.  We're more of like
24     financial.
25          THE COURT:  And it looks like you have not served on

1  a jury?

2          PROSPECTIVE JUROR NO. 45:  I have not.

3          THE COURT:  ███████████

4          PROSPECTIVE JUROR NO. 46:  Yes, sir.

5          THE COURT:  Longhorn Glass, that sounds like a good

6  Texas company.  What do you do there?

7          PROSPECTIVE JUROR NO. 46:  We make glass, make the

8  bottles for the beer.

9          THE COURT:  You make what for the beers?

10          PROSPECTIVE JUROR NO. 46:  The bottles.

11          THE COURT:  The bottles, okay.

12              Is that a fully owned subsidiary or is it a

13  contract to the beer companies?

14          PROSPECTIVE JUROR NO. 46:  Some are farmed out.

15          THE COURT:  So do they have a plant around here

16  anywhere?

17          PROSPECTIVE JUROR NO. 46:  By there.

18          THE COURT:  Out there.  So you make them right next

19  to the thing and you just walk next door and have a track

20  going over?

21          PROSPECTIVE JUROR NO. 46:  It's about 10 minutes.

22          THE COURT:  About 10 minutes.

23              I see that your wife is in certified nursing,

24  correct?  Is she an RN or an LVN?

25          PROSPECTIVE JUROR NO. 46:  A CNA.

 1              THE COURT:  A CNA.  That's certified nurse

 2     anesthetist or certified nursing assistant or what?

 3              PROSPECTIVE JUROR NO. 46:  Assistant.

 4              THE COURT:  Assistant, okay.  What does she do for

 5     the company, a home health?

 6              PROSPECTIVE JUROR NO. 46:  Takes patients like older

 7     people and changes them.

 8              THE COURT:  Take care of them personally?

 9              PROSPECTIVE JUROR NO. 46:  Yes.

10              THE COURT:  Does she go to people's homes?

11              PROSPECTIVE JUROR NO. 46:  Yes.

12              THE COURT:  Is there anything -- does she deal with

13     Medicare and Medicaid folks?

14              PROSPECTIVE JUROR NO. 46:  No.

15              THE COURT:  Not that you know of?

16              PROSPECTIVE JUROR NO. 46:  No.

17              THE COURT:  So you have never discussed any of those

18     sort of problems with her because it has to your knowledge

19     not occurred relative to her professional duties, correct?

20              PROSPECTIVE JUROR NO. 46:  No.

21              THE COURT:  Okay.  Thank you.

22              I bet you thought we would never get to you,

23     ████████████

24              Sweetwater Mortgage Company, what exactly do

25     you do with them because I see you have got a marketing

1  degree; is that correct?

2          PROSPECTIVE JUROR NO. 47:  Right.  Loan officer and

3  also help with the books.

4          THE COURT:  Okay.  You have made one criminal

5  complaint.  Was that resolved at least to your satisfaction

6  with the system itself, the court system?

7          PROSPECTIVE JUROR NO. 47:  Yes.

8          THE COURT:  So there's nothing, based upon that in

9  the court system, that you would be adverse to the system

10  itself, correct?

11          PROSPECTIVE JUROR NO. 47:  No.

12          THE COURT:  Ladies and gentlemen, I have got one or

13  two quick questions I need to ask the attorneys, and then we

14  can give everybody a short break, depending upon where you

15  were raising your hand, so it will get done that way.

16          But give me just a moment.  I am going to head

17  back to my perch back there.  I think it's a lot easier doing

18  it from here back there.  So give us just a second.  We will

19  take a break in one or two minutes.

20          May I see the attorneys up there at my bench,

21  please.

22          (Conference before the bench)

23          THE COURT:  We started well.  It's almost 12:00

24  o'clock,.

25          Any other questions you think ought to be asked

1  generally?

2          MR. McALISTER:  Your Honor, I have one question, but

3  I don't know how to phrase it.  So we have about three or

4  four people we are going to talk about as part of the

5  conspiracy, but the jurors are not going to know what

6  happened to them.  They pled guilty, and we don't think that

7  will be appropriate.

8          THE COURT:  I don't need to tell it to them.

9          MR. McALISTER:  Okay.  We just wanted them to know

10 that not every question they have may be answered.

11         THE COURT:  Okay.  Anything further?

12         MR. DUPONT:  Your Honor, the only note I had was

13 regarding character evidence.  The defense intends to put on

14 five or six witnesses regarding character evidence, and there

15 is a pattern jury instruction on character evidence.

16         THE COURT:  Well, I give it at that point.

17              Anything further?  Let's get these folks on

18 their way.  Hold it.  Stay right here.

19              Ellen, do you have the numbers?  Hang on one

20 second.  We have got to get the folks up here.  By the way,

21 when they come up, if you would step back a little bit on

22 this side.  This is the microphone, and then you will gather

23 around.

24              What are the numbers?

25         CASE MANAGER:  16, 20, 32, 34 and 36.

1        THE COURT:  All right.  Ladies and gentlemen, these
2   are the folks we are going to need to come up.  So until you
3   come up, stick around or make a quick walk and then come up.

4        Jurors -- and I will call you up one at a
5   time -- 16, 20, 32, 34 and 36.

6        Let me explain to you what it is.  As far as
7   restroom facilities, they're right outside, right opposite
8   the back of this wall to my left.  So go out and make an
9   immediate left.  There are some.

10       Also, just picture this is a long hallway.  Go
11  all the way down to the far end of the hall past the elevator
12  banks to the far end of the building, turn left and go down
13  there, there are some restrooms down there.

14       We are going to get these folks done quickly
15  and then literally two more minutes and you'll take your
16  lunch break, okay.

17       So, again, we need you to get back in here.
18  Nobody is excused from jury duty.  I want to tell you a story
19  about that later, but we are going to call the first Juror,
20  No. 16.  ▮▮▮▮▮▮▮▮▮  you want to come up this way, sir.

21       PROSPECTIVE JUROR NO. 16:  I may have heard the
22  question wrong, but I heard --

23       THE COURT:  No, no.  Right up here.  Again, there is
24  the mic, so face me.

25       PROSPECTIVE JUROR NO. 16:  Yes, sir.

1          THE COURT:  Take about a half a step back.  That's

2    it.  That way everybody can hear and the jurors back there

3    can't.

4               Let me find your number, No. 16.

5               Yes, sir.  Your son, you want to just explain.

6          PROSPECTIVE JUROR NO. 16:  My son is an opioid and

7    alcohol addict.

8          THE COURT:  Opioid addict.

9               I tell you what.  I am going to turn it over to

10   the attorneys, okay, you can ask some questions.

11         MR. CHU:  When you were dealing with your son's

12   addiction -- I am so sorry to hear that.

13         PROSPECTIVE JUROR NO. 16:  Thank you.

14         MR. CHU:  -- was there anything about that in

15   dealing with law enforcement that you thought was unfair?

16         PROSPECTIVE JUROR NO. 16:  No.  There hadn't been

17   any law enforcement interactions whatsoever.  He's just been

18   in recovery.

19         MR. CHU:  And I wish him the best of luck.

20         PROSPECTIVE JUROR NO. 16:  Thank you.

21         THE COURT:  Any questions?

22         MR. DUPONT:  Yes, briefly.

23               And my sentiments as well.

24               Regarding that situation, this anticipates to

25   be perhaps a week-long jury trial.  That situation, would it

1  cause you --

2          THE COURT:  No.  I will ask that in my catch-all

3  question.  Remember -- well, you don't know.  I ask that.

4  I'm sorry.

5          At the very last thing I am going to do, ask a

6  catch-all question:  Is there anything that the jury that is

7  not on the sheet that I haven't asked, okay.

8          So you may ask it.  Let me ask him while you're

9  up here.  It will take a week.  You understand that this may

10  take a week if you're selected?

11          PROSPECTIVE JUROR NO. 16:  I can do that, yes, sir.

12          THE COURT:  Sure, okay.  Any other questions?

13          MR. DUPONT:  That wouldn't affect your ability to be

14  fair and impartial in this trial?

15          PROSPECTIVE JUROR NO. 16:  Absolutely not.

16          THE COURT:  Thank you, sir.  Now you take a break,

17  if you would, for a few minutes.

18          PROSPECTIVE JUROR NO. 16:  Thank you.

19          THE COURT:  I'm sorry.  I didn't mention that.

20  That's my catch-all question.  As soon as they come back in,

21  when they're all back in I say, now there is nothing here and

22  there is nothing I haven't asked or whatever that would

23  affect your ability to serve on this jury.  It's the last

24  catch-all before we start making strikes.

25          MR. DUPONT:  Yes, Your Honor.

1           THE COURT:  No. 20, please.  What was his concern?

2           MR. CHU:  I think it was the same, wasn't it?

3           CASE MANAGER:  Law enforcement question and issue

4      with drug and alcohol.

5           THE COURT:  ███████████  is that correct?

6           PROSPECTIVE JUROR NO. 20:  Uh-huh.

7           THE COURT:  Okay.  What was your concern, ma'am?  We

8      called you up here.  I think there were a couple of points

9      you may want to discuss with us.

10           PROSPECTIVE JUROR NO. 20:  My youngest son was in

11      federal court in New York for drug trafficking.

12           THE COURT:  He was convicted?

13           PROSPECTIVE JUROR NO. 20:  For drug trafficking.  So

14      I had to go and serve as a character witness.

15           THE COURT:  What was the result?

16           PROSPECTIVE JUROR NO. 20:  He was on probation for

17      18 months.

18           THE COURT:  You know probation is very rare in

19      federal court?

20           PROSPECTIVE JUROR NO. 20:  Very, very rare; very

21      blessed.

22           THE COURT:  Who was the judge, do you remember?

23           PROSPECTIVE JUROR NO. 20:  Oh, I can't even

24      remember.  That's been --

25           THE COURT:  This was federal court in New York?

1          PROSPECTIVE JUROR NO. 20:  Yes, sir.

2          THE COURT:  What was the other question about law

3  enforcement?

4          PROSPECTIVE JUROR NO. 20:  No.  Was it law

5  enforcement or drug addiction?

6          THE COURT:  Law enforcement.  That was the drug

7  concern, right?

8          PROSPECTIVE JUROR NO. 20:  Yes, it was that as well.

9          THE COURT:  Did he have a drug problem?

10          PROSPECTIVE JUROR NO. 20:  Yes, sir.  He did.

11          THE COURT:  Okay.  How is he doing now?

12          PROSPECTIVE JUROR NO. 20:  Oh, he's been clean since

13  2011, praise God.

14          THE COURT:  Questions.

15          MR. CHU:  You know from our concern we know that

16  sometimes people are not always happy with how law

17  enforcement treated their family and stuff, and just

18  sometimes it just happens.  And all I want to do is make

19  sure.  We had nothing to do with any of that, obviously, we

20  never met your son.  It was a drug trafficking crime.

21              Do you think you would hold it again us in any

22  way the things that happened to your son?

23          PROSPECTIVE JUROR NO. 20:  No.

24          MR. CHU:  Do you think that law enforcement there

25  treated your son unfairly or anything?

1              PROSPECTIVE JUROR NO. 20:  No, no, I don't.

2              THE COURT:  Say that again.

3              MR. CHU:  I just wanted to see if law enforcement

4    had treated her son unfairly in any way.

5              THE COURT:  Okay.  Anything?

6              MR. DUPONT:  Your Honor, briefly.

7                   Would that experience cause you to have any

8    bias here in this trial?

9              PROSPECTIVE JUROR NO. 20:  No.

10             THE COURT:  Thank you, ma'am.

11             PROSPECTIVE JUROR NO. 20:  If you have a concern, I

12   have had shingles in my eye, and if this will go until

13   possibly next week, I have an appointment on Monday as a

14   follow-up, and this is something we have been dealing with

15   for --

16             THE COURT:  Who is the doctor?

17             PROSPECTIVE JUROR NO. 20:  Dr. Paul Mann.

18             THE COURT:  Oh, okay.  So you have a follow-up.

19   What time is the appointment?

20             PROSPECTIVE JUROR NO. 20:  That's at 8:00 o'clock in

21   the morning.

22             THE COURT:  8:00 a.m.?

23             PROSPECTIVE JUROR NO. 20:  Yes, sir.

24             THE COURT:  Where is the office?

25             PROSPECTIVE JUROR NO. 20:  Katy.

1         THE COURT:  All right.  That's far out.

2              Anyhow, thank you so much.

3         PROSPECTIVE JUROR NO. 20:  Okay.  Thank you.

4         THE COURT:  Do we have any challenge on No. 20

5    because she says she couldn't make it if it goes over to

6    Monday.

7         MR. DUPONT:  None from the defense, Your Honor.

8         MR. CHU:  I don't think we have a challenge, Your

9    Honor.  I do understand that Katy is a long way from here;

10   and if she does have a meeting at 8:00 o'clock in the

11   morning, I know the Court starts at 10:00 o'clock in the

12   morning, so I --

13        THE COURT:  But that's a long way out.

14        MR. CHU:  Yes, Your Honor.  That does give me a

15   little bit of pause.

16        THE COURT:  What's the problem?  What's the concern?

17        MR. CHU:  I just want to make sure she doesn't feel

18   that she's rushed in her medical care.  I don't think it

19   necessarily affects the jury.  This is more just out of a

20   sense of mercy.

21        THE COURT:  What do you think?

22        MR. DUPONT:  Your Honor, there is 17 government

23   witnesses and 5 from the defense.

24        THE COURT:  But you are not going to call them all,

25   I can tell you that, not the way I try a case.  You are going

1  to move it along.

2          MR. DUPONT:  Judge, we should probably be done by

3  Friday then.

4          THE COURT:  Well, but then again, Monday we have to

5  have closing arguments, something like that.

6              I am going to excuse No. 20.  I think we have

7  plenty, plenty.

8          MR. CHU:  No objection, Your Honor.

9          THE COURT:  ██████████  please.  Yes, sir, you said

10  you had -- step back about half a step so everybody can hear,

11  and that's the microphone.

12              Yes, sir, your concern.

13          PROSPECTIVE JUROR NO. 32:  You picked me up on two.

14  One was the law enforcement and one was drug and alcohol

15  addiction.

16              When I was deployed overseas we had an NYPD who

17  knew he was getting called up from IRR to escape being served

18  process for certain civil rights concerns, so it somewhat

19  undermined my confidence.

20          THE COURT:  In what, law enforcement?

21          PROSPECTIVE JUROR NO. 32:  In the profession, but --

22          THE COURT:  Would it affect you being fair and

23  impartial in this case without having heard any of the

24  evidence?  Only you know.

25          PROSPECTIVE JUROR NO. 32:  No, Your Honor.

1          THE COURT:  Okay.  Questions.

2          MR. DUPONT:  None here, Your Honor.

3          THE COURT:  Thank you, sir.  Thank you for bringing

4   it to my attention.

5          PROSPECTIVE JUROR NO. 32:  And then the drug and

6   alcohol, sir.

7          THE COURT:  Oh, yes.  What's that?

8          PROSPECTIVE JUROR NO. 32:  I was diagnosed with

9   alcoholism as a teenager, Your Honor.

10          THE COURT:  And anything going on right now as far

11  as you are concerned?

12          PROSPECTIVE JUROR NO. 32:  No, Your Honor.

13          THE COURT:  Okay.

14             Questions?

15          MR. DUPONT:  None from the defense, Your Honor.

16          MR. CHU:  Your Honor, if we can just explore the law

17  enforcement issue again a little bit.

18          THE COURT:  All right, if you want to.

19          MR. CHU:  First of all, I'm sorry to here that there

20  was someone who undermined your confidence in law

21  enforcement.  I didn't quite understand what had happened.

22          PROSPECTIVE JUROR NO. 32:  He was an NYPD officer,

23  and when he was off duty a black man touched his car and he

24  chased him down and he ended up going to another department

25  on probation as a result.  And when the person he chased down

tried to serve him process, he used IRR, which he had been
dodging, which is when you leave the military you can be
recalled back for a number of years and then dodging being
called back.

THE COURT:  But the bottom line, is there anything
about that that would prohibit you from being fair and
impartial to the government agents as well as the defense in
this case?

MR. CHU:  Because you didn't just say that.

THE COURT:  Wait.  I asked the question.  Yes or no?

PROSPECTIVE JUROR NO. 32:  No, Your Honor.

THE COURT:  Now if you want to follow it up briefly.

MR. CHU:  You didn't say that you had undermined
your confidence in him as a person.  You said in all law
enforcement, and that's what I just wanted to kind of explore
a little bit more, because we certainly have some law
enforcement agents, the FBI agents, one Health and Human
Services person.  I mean, they're just going to talk about
things they saw.

THE COURT:  I didn't read the list of the witnesses.

PROSPECTIVE JUROR NO. 32:  It had me come to the
realization that law enforcement can and do lie during times
of conflict.  They're like any other profession.  There are
good and bad.  I met a lot of other cops in the guard, and a
lot of them, most of them, nearly all of them are exemplary;

1    but, you know, he was not the good individual.

2         THE COURT:  All right.

3              Anything further?  But you say you could be

4    fair and impartial in this case, right?

5         PROSPECTIVE JUROR NO. 32:  Yes, Your Honor.

6         THE COURT:  Thank you.  Take your seat.

7         MR. CHU:  Thank you.

8         MR. DUPONT:  Thank you.

9         THE COURT:  Do we have any challenge of this man?

10        MR. CHU:  Your Honor, he said -- I want to focus on

11   his exact remarks, but he didn't say --

12        THE COURT:  I heard them.  What do you object to, if

13   anything?

14        MR. CHU:  I am concerned that he might not be able

15   to be fair and impartial to law enforcement.  He said, he

16   didn't just say that this one man had been unfair.  He said

17   this calls into question all law enforcement.  And I can also

18   hear the tremor in his voice and the emotion as he was saying

19   that.

20        MR. DUPONT:  Your Honor, he told you twice he could

21   be fair and impartial.  We have no challenge.

22        THE COURT:  Okay.  Do you have on objection?  Do you

23   have a challenge for cause?

24        MR. CHU:  We have a challenge for cause.

25        THE COURT:  Overruled.

1          MR. CHU:  Thank you, Your Honor.

2          THE COURT:  No. 34, what's the problem there?

3          CASE MANAGER:  Fair and impartial.

4          THE COURT:  ███████████  please.

5              Yes, ma'am.  Your concern.

6          PROSPECTIVE JUROR NO. 34:  Because I work, I have a

7  patient like this overdoses on drugs once, and so I don't

8  want to use my personal experience to be --

9          THE COURT:  You think this might not be the right

10  case for you?

11          PROSPECTIVE JUROR NO. 34:  Uh-huh.  I might use my,

12  you know, work experience to be -- it might influence.

13          THE COURT:  So you have a concern?

14          PROSPECTIVE JUROR NO. 34:  Uh-huh.

15          THE COURT:  All right.  Government, questions, if

16  any?

17          MR. CHU:  No questions, Your Honor.

18          THE COURT:  Any questions?

19          MR. DUPONT:  No.  Motions.

20          THE COURT:  Take a seat.

21              Come on in.  Do we have a challenge on No. 34?

22          MR. DUPONT:  Yes, Your Honor.

23          THE COURT:  You do, too?

24          MR. CHU:  No objection, Your Honor.

25          THE COURT:  No. 34 is challenged for cause.

1           There is a reason why I am going this high, and
2  I will tell you in just a moment.
3           Last one, No. 36.
4           CASE MANAGER:  Fair, impartial and drug and alcohol.
5           THE COURT:  ██████████████
6           PROSPECTIVE JUROR NO. 36:  I would like to address
7  the issue that was not asked of me, to be fair to the process
8  which I respect so much.
9           My husband is a prosecutor.  He's a very good
10 prosecutor.  My husband only takes to trial cases he is very
11 sure of.  And I fear that even though I know I should be fair
12 and impartial, the prosecution sometimes starts at a higher
13 level with any because --
14          THE COURT:  Okay.  They don't start equal, which is
15 understandable.  Is that basically what you are saying?
16          PROSPECTIVE JUROR NO. 36:  Yes.
17          THE COURT:  Any questions from the government, any
18 questions?
19          MR. CHU:  What do you mean by -- thank you, Your
20 Honor.  What do you mean by the government starts on a higher
21 level?
22          THE COURT:  I think I understand completely.
23          Any questions from the defense?
24          MR. DUPONT:  No, Your Honor.
25          THE COURT:  Thank you.

1              Yes, ma'am.  Thank you.

2              That was clear.  That was clear.  That's what I

3    mean.  I didn't want to put her through anything else.

4              MR. CHU:  I just want to make a record.

5              THE COURT:  Do we have a challenge?

6              MR. DUPONT:  Yes, Your Honor.

7              THE COURT:  What's the challenge, just for the

8    record?

9              MR. DUPONT:  Can't be -- she is biased and can't be

10   fair and impartial.

11             THE COURT:  Sustained.

12             Okay.  We can call the jurors back in.

13             I am going to read -- I forgot I need to read

14   the witness list.

15             By the way, I am not being absolute.  This case

16   is going to get done quickly.  You don't want me jumping into

17   your case.  For instance, the witnesses short and to the

18   point.  The same thing here.  If it starts bogging down, you

19   are going to have me in your case.  That's all I am saying.

20   I am not saying no, okay, but let's get it going.

21             MR. CHU:  Yes, Your Honor.

22             THE COURT:  We are going to talk about that.  I will

23   tell you what I am doing.  I will give you more strikes than

24   ordinarily, 6 and 10, if you want to strike up and down the

25   whole panel, just excluding these jurors.  It's not

1  mandatory, but ordinarily the government gets 10 or usually

2  11 because I do a blind draw.  So you'd have 11 and you'd

3  have 7 and you can strike through 32 with the blind draw.

4  That means at the end of the trial -- once you get to your

5  place you may be seated -- that way nobody is an alternate

6  until the very end.  They don't know the difference.

7           Anybody object to that?  I have used that for

8  years.

9           MR. CHU:  No objection.

10           MR. DUPONT:  We have how many, Your Honor, you said?

11           THE COURT:  In federal court, you know how many.

12           MR. DUPONT:  10 for us.  I'm saying --

13           THE COURT:  10, you get an extra -- well, first of

14  all, with the blind draw, that means there is no alternate,

15  but you get to challenge all the way up and down the whole

16  panel.  So right now No. 32 in the panel, 7 and 11.

17           And now after it's done I am going to offer you

18  more strikes if you want to take them.  You do not have to.

19           MR. DUPONT:  Okay.  Thank you, Your Honor.

20           THE COURT:  Why don't you have a seat, and then we

21  will see.  If we get more hands we may -- I tell you what,

22  hold on.  Just step off to the side.  I am going to read this

23  list.  Everybody here?

24           All right.  Ladies and gentlemen, I am going to

25  read you a list of witnesses.  I told the lawyers if they

 1  call all these witnesses, they better move through them
 2  quickly, okay.  And so these are the names of some folks who
 3  may be floating through the trial, names that may be
 4  mentioned.  They may be called; they may not be called.  And
 5  I am talking to my court reporter.  I will give you these
 6  lists, Fred, when I am done.
 7              THE REPORTER:  I have got a list.
 8              THE COURT:  You got a list already.
 9              They may or may not be called.  I am not
10  telling you who may call them.  I am going down the list.  I
11  am going to read all of the names, and then I will see if
12  anybody knows them, okay.
13              William Marlowe, Kevin Lammons, Samantha Sosa,
14  Sandra Garcia, Melissa Morales, Virginia Rivas Lopez, Amanda
15  Sanchez Lopez, Yessica Salamanca, Laura Corvera, Janette
16  Corvera, Sonja Reyna, Paul Nixon, Tiffany Smith, Monica
17  Roberts, Elena Martinez, Kathy Anderson, Donna Large, Jack
18  McCoy, Sara Moran, Hedva, H-e-d-v-a, Williams, Shir
19  Noy-Enbal, E-n-b-a-l, Chana Batomsky, Mendel Feigenson, Nina
20  Gozes, G-o-z-e-s.
21              Anybody know any of these folks?
22              Let the record reflect no hands were raised.
23              Now this case is a short case.  It's going to
24  move along.  I think you can see it will move along.  The
25  bottom line is now, keeping in mind other cases that have

1 been floating through here, and we have discussed some

2 reasons, if there is anything else that either I haven't

3 mentioned or that's not on the sheets that might affect your

4 ability to serve on this jury, we need your hands.

5            All right.  Thank you.  We have one.  Let's

6 call that juror up, please.  Yes, come on up.

7                    (At the bench)

8            THE COURT:  This is No. 25.  You are okay.  Step

9 back half a step.

10           PROSPECTIVE JUROR NO. 25:  I am not even sure this

11 qualifies.  I have a dental appointment Wednesday.

12           THE COURT:  This Wednesday?

13           PROSPECTIVE JUROR NO. 25:  This Wednesday.  If I

14 don't do it this Wednesday, it will be put off until

15 November.

16           THE COURT:  Didn't they mention that?

17           PROSPECTIVE JUROR NO. 25:  It's something I can put

18 off.

19           THE COURT:  We'll, no.  That's okay.  You tell me.

20 I mean, it's up to you.  If you are selected, we are going to

21 be in session on Wednesday.  What time is your appointment?

22           PROSPECTIVE JUROR NO. 25:  I will move it.

23           THE COURT:  What time is your appointment?

24           PROSPECTIVE JUROR NO. 25:  8:00.

25           THE COURT:  Well, we don't get underway until 10:00.

1           PROSPECTIVE JUROR NO. 25:  No.  It's an extraction.

2           THE COURT:  Oh, okay.

3           PROSPECTIVE JUROR NO. 25:  Which is why it will be

4  put off to November because I do vacation.

5           THE COURT:  If you are selected.  And you will see

6  it's not really a matter of selection, it's a matter of

7  elimination if you are selected.

8           PROSPECTIVE JUROR NO. 25:  Right.  Awesome.

9           THE COURT:  If you are selected, then you'll do it.

10          MR. CHU:  An extraction is usually pretty painful.

11 Will you be in condition the next day?

12          PROSPECTIVE JUROR NO. 25:  No.

13          THE COURT:  You're okay then.

14          PROSPECTIVE JUROR NO. 25:  Yeah.  I will just put it

15 off.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR NO. 25:  Because I have had

18 problems in the past and don't want it to interfere with

19 vacation a couple of weeks.

20          THE COURT:  It's up to you.  Thank you, ma'am.

21          MR. CHU:  Your Honor, there is one more person on

22 our trial team who just walked in.  Deborah Gregory is our

23 legal assistant.  She's right there.

24          THE COURT:  If you want to.

25              All right.  Ladies and gentlemen, we have one

1    other member of the trial team.  Counsel, do you want to
2    introduce your associate?
3            MR. CHU:  Yes, Your Honor.  Probably the most
4    important part our trial is Deborah Gregory, our legal
5    assistant.
6            THE COURT:  They can't see you behind the pole.  I
7    know that.
8            MR. CHU:  And she keeps us organized.
9                Thank you, Your Honor.
10           THE COURT:  Okay.  Now let's go down our lists, the
11   ones that have been struck.
12               No. 19.
13           CASE MANAGER:  No. 20.
14           THE COURT:  I'm sorry.  20, 34 and No. 36.
15               Now, ordinarily here's the way I do it with the
16   blind draw.  It's 7 and 11, and we seat how many?  We seat
17   14, right?
18           CASE MANAGER:  Yes, sir.
19           THE COURT:  And the total of that is 32, right?
20           CASE MANAGER:  Right.
21           THE COURT:  Usually 32 then is in the panel, but you
22   have No. 20 has been struck, right?
23           CASE MANAGER:  Correct.
24           THE COURT:  So minus one.  So now 33 is in the
25   panel.

 1                    Now, we have how many people here?

 2          CASE MANAGER:  47.

 3          THE COURT:  We have 47.  But in the next group we

 4   have 34, who's out, right, and 36 who's out.

 5                    So 33 to 47 are how many?  What's the number?

 6          MR. CHU:  12 remaining, Your Honor.

 7          THE COURT:  That's 12, right?

 8                    Let's see, 33, 43.  We have 14.  But there is

 9   two in that area who have been struck.  So minus two.  So

10   there are 12 left.

11                    In the same proportion of 6 to 10, 6 to 10, you

12   want additional strikes and we'll just apportion them how the

13   same proportion is, or you want to go just with 7 and 11?

14   You call them.  Do you want additional strikes?  I will let

15   you go up and down the whole panel.

16          MR. CHU:  7 and 11 is fine with me, Your Honor.

17          THE COURT:  Okay.  We have to have an agreement.

18          MR. DUPONT:  We'll do 7 and 11.

19          THE COURT:  Okay.  Then I need an agreement.  As

20   long as one objects, one objects.  Therefore, I am looking at

21   No. 33 is in the panel, 33 is in the panel.

22          MR. CHU:  Yes, sir.

23          THE COURT:  And so you make your strikes

24   accordingly.

25                    All right.  We are going to take a break.  It's

1    now, let's say, 12:30.

2              Do I have something at 2:00 o'clock?

3              CASE MANAGER:  A short pretrial conference.

4              THE COURT:  To who?

5              CASE MANAGER:  Just a short pretrial conference.  We

6    are just setting a trial date in a civil case.

7              THE COURT:  So we can do it up here at the bench if

8    we have to, right?

9              The jury can go out for five minutes.  What

10   time do we get the jury back?  It's 12:30.

11             Let's do it 2:15.  I can get rid of that civil

12   case, then we can go right on with the case.  That would be

13   2:30, 3:30.  Let's do it that way.  That way there will be

14   no -- we will just seat the jury, I will give them the

15   instructions and you have your opening statements.

16             By the way, how much time does the government

17   want for opening statement?  I will tell you with me an

18   opening statement is nothing more than what the evidence will

19   show.  How much time?

20             MR. CHU:  I would say about 15 minutes, Your Honor,

21   plus or minus two.

22             MR. DUPONT:  We are requesting 30, Your Honor.

23             THE COURT:  I will give you 15.  That's a lot for

24   me.  Usually it's because, just tell me where it's going, and

25   there it is.

1            By the way, I am saying this just as a matter

2    of fact, that the Fifth Circuit, as you may know, is the lead

3    circuit in the United States for timing orders in civil cases

4    and in criminal cases.  Even in that monster Stanford case I

5    had the lawyers on a clock.  No, this is it.  I mean, every

6    time you get up, it starts going, okay.

7            MR. CHU:  Your Honor, is that a chess clock?

8            THE COURT:  Yes, it is.  By the way, there's only

9    one program where the numbers go up.  On a chess clock most

10   of the time it goes down.

11           I am not going to put the timing order on yet.

12   I will if I have to if it take too long.  As I say, it's the

13   lead circuit, especially in criminal cases, where you can do

14   that in the United States, so I am confident.  I wouldn't

15   have messed around with that Stanford case if I thought there

16   was a problem.

17           You tell me the time, testimony gets done on

18   schedule, fine.  We have to get out of here, plus or minus a

19   few minutes, 3:00 o'clock on Friday.

20           I will tell you this.  Every Tuesday, that's

21   tomorrow, we begin at 11:30, every Tuesday at 11:30.  Aside

22   from that, we go from 10:00 a.m. to 6:00 p.m.

23           MR. DUPONT:  Some brief questions, Your Honor.

24           THE COURT:  Sure.

25           MR. DUPONT:  Would you give a two-minute warning on

1  the 15 minutes?

2              THE COURT:  If you want to, yeah.

3              MR. DUPONT:  Just so I know.

4              THE COURT:  Sure.

5              MR. DUPONT:  And my second question.  6:00 p.m.

6  today, we are working to 6:00 p.m. today?

7              THE COURT:  That's correct.

8              MR. CHU:  Your Honor, just going back to Tuesday,

9  starting at 11:30, so will the jurors know that?

10             THE COURT:  Oh, yeah.

11             MR. CHU:  They can have lunch before.

12             THE COURT:  Oh, sure.  No, we take a lunch break

13  because they get in here.  We take a lunch break from 1:00

14  to 2:15.  I have found that extra 15 minutes is important,

15  from feedback from them, because after 9-11 the security was

16  greatly enhanced; and sometimes there is a line there and

17  they can't get across the street and back in 30 or 45 minutes

18  and then get caught in a line.

19             A lot of the stuff you saw me doing before was

20  for one purpose only, to get us a good jury, they're upbeat.

21  And just stop and think.  You've tried cases for many years,

22  all of you.  You don't get just one hand going up with a

23  catch-all question.  And that's what we want.  We want people

24  enthusiastic about sitting, and that's the way it is.  And I

25  just back off and let you do your thing.

1          Okay, thanks.  Have a seat.

2                (In open court)

3          THE COURT:  As far as the attorneys go, we will need

4    your sheets back up here with the strikes on them by 1:45

5    on Ellen s desk, okay.  You can do them right away.  I will

6    talk to you a bit about that after.  No, I won't have time

7    because I leave.

8                Ladies and gentlemen, let me explain to you

9    what we will be doing at this time.  Each of the lawyers have

10   the sheets, the juror sheets with all of your names on them.

11   I think I have got two of them in here somewhere.  For

12   whatever reason, for whatever reason the attorneys may strike

13   through a certain number of names.

14               After that's done, my case manager, Ellen

15   Alexander, puts the two side by side and with a long ruler

16   goes across both sheets.  The first 14 names that she comes

17   to that has no strike, either on the government list or the

18   defense list, forms the jury.

19               So, in effect, jury selection is not a matter

20   of selection, it's a matter of elimination.  So people go

21   home and say, I've been selected to serve on a jury.  They

22   say no, you haven't.  They wanted other people off worse than

23   you.

24               That's when I sat on the jury.  I think each of

25   them thought the other was going to strike the Judge.  I

1   found out later on they know we could get ahold of those
2   sheets so they didn't want to know they're the ones that
3   threw me off the jury.  They told me that later on.

4          But in any case, to allow for this, the
5   attorneys have to confer with their clients and determine who
6   gets struck.  So when I leave -- and I will be leaving in
7   about two minutes -- you will be asked to be seated.  The
8   attorneys may not be familiar with this.  You will be asked
9   to be seated, and you can walk around with the sheets, put a
10  name with a face for about two minutes, then the jury will be
11  excused.

12         I have got one other thing set this afternoon,
13  and I want to do that so it does not interfere with this
14  trial.  So they have to make their strikes.  Once they
15  decided on it, they need to give it to my case manager, and
16  then the attorneys and their clients can first take a lunch
17  break.

18         So we are going to take what may seem like a
19  long break.  I don't make a habit of it, but it's only this
20  first go around.  Again, the voir dire has moved along
21  quickly, and we want to thank you for your assistance.

22         So, I will tell you in a moment when we need
23  you back in here because the attorneys know when they have to
24  complete their strikes.

25         When we get back in, the first thing we will do

is we will name who's on the jury.  We have 14 jurors.  And
then at that point everybody else will be excused.  But by
the way, I want to mention to you, you are not excused from
jury duty.  Now, why do I say that?

In all of my experience, I had one guy in state
court where a voir dire like this would have gone at least
for a whole day, maybe into the second day.  He told the
bailiff out there and other jurors, "I've had enough of this
jury duty.  I'm going back to work."

So we get back in, we call his name and he's
not there.  So I tell the sheriff -- now we have a Marshal,
you see we have a U.S. Marshal -- but called his name three
times and he wasn't in the hallway, but we knew where he
worked.

So I issued an arrest warrant for him, and I
told the sheriff, give him the full business with the siren
and the lights and everything.

Now, some of you are of an age you may remember
that before we got the train down Main Street the businesses
that you are ran into mostly further down Main Street close
to Allen's Landing where the state courts are were either
shoe stores or pawn shops.  A pawn, that's p-a-w-n.

Why do I spell that?  I'd been doing this job
for 10 years, and I gave this talk to everybody.  So one of
the official court reporters came up and said, Judge, that

1   word you have been using, okay -- this is my court

2   reporter -- he says, is that p-a-w-n?

3                   I said yeah.

4                   And he said, well, for the last 10 years in

5   federal court it's been going up to the court of appeals

6   p-o-r-n.  That's why I spell it out now, okay.

7                   Got it, Fred?

8                   THE REPORTER:  Yes.

9                   THE COURT:  He wasn't the one who ratted out

10  everybody.

11                  Anyhow, he worked at one of those shoe stores

12  that was real close to the state courthouse.  So I hear later

13  they drove up, the siren's going on, the light's on.  He's

14  fitting a woman with a pair of shoes.  They collar him and

15  cuff him.  They bring him back in front of the same jury

16  panel because that voir was going on for a day-and-a-half.

17  So not only do I have his attention, but I got the jury's

18  attention also, of course.

19                  So I gave him -- now, we were told, I was told

20  he had some money in his pocket.  I gave him three days in

21  the county jail and a hundred-dollar fine for contempt of

22  court; but he went down and paid it and they then brought him

23  back up in front of me, and I gave him an option, three days

24  in the county hotel or at 9:00 a.m. and at 12:00 noon for the

25  next seven business days report to the central jury room over

1  there and listen to those juror lectures over and over.

2              And it's not as simple.  Now when you do it

3  it's all in videotape.  Over there, we as elected judges had

4  400 voters every morning, 400 voters every afternoon and we

5  had an audience going.  And he heard the same, I wouldn't say

6  election deal, but he heard the same stories over and over 14

7  times.  I don't know what was worse.

8              Also once here about 10 years ago I had one

9  juror didn't show up after the lunch break, and I asked the

10  other jurors, where is that guy?

11              They said, I don't know.  We saw him in the

12  tunnels or whatever.  Make a long story short, it was a

13  gorgeous day and he fell asleep in Tranquillity Park on a

14  bench.  They sent the Marshals out with a description of him.

15  They found him there.  They brought him back in.

16              We've got a little bit of time.  This actually

17  happened.  The chief Judge of the circuit, some of the

18  lawyers may remember Hank Politz.  He was Chief Judge of the

19  circuit, a wonderful man from Cajun country.  He was from

20  Louisiana from, he said, you know, up the bayou a couple

21  miles from Napoleonville.  He was trying as a trial court.

22  He said, I wanted to try a case.  It was a trying case in San

23  Antonio.

24              And he gets back after one of the breaks and he

25  starts in and the lawyers come in and said, you know, lawyer

1   No. 7, that's not Mrs. Johnson.  And look over there, and
2   it's not Mrs. Johnson.
3                   So he asked No. 7, what's your name?
4                   She says, my name is Mrs. Smith.
5                   So wait a minute.  So they put the whole jury
6   out and they got that juror in.
7                   He said, well, where is Mrs. Johnson?  She's
8   supposed on the jury.
9                   And she says, well, you know, the two of us are
10  going to a wedding this weekend, and Ms. Johnson had to have
11  her hair done; and I agreed to sit in and I am going to tell
12  her everything that's going on.
13                  So this is the Chief of the circuit.  But he
14  had a sense of humor, so he waited until the other lady got
15  back from the hair dresser, let her have it and continued on.
16  So I am not sure we will have a situation like that.
17                  But by the way, I told the attorneys, I
18  mentioned a lot of witnesses to you as to who they are.  They
19  may not call them all.  They're going to move the case along.
20  Otherwise I have got something else we discussed up here that
21  will move it along.
22                  It's a serious matter.  We appreciate very much
23  your being with us.  It's a serious case.  Nothing that I
24  have said or done is going to affect your deciding on it, and
25  you will get that instruction.  Anything the Judge says you

are to disregard, because there are two judges in a case
always.  I'm the Judge of the law.  I will give you the law
and the instructions, but the judges of the facts, that's the
jury.  I have no input on that.  You're the judges of the
facts, what went on, who do you believe and the weight to be
given their evidence, their testimony, and keeping in mind
all the time that in a criminal case the burden never shifts
for the defendant.  The government has to prove each element
beyond a reasonable doubt, and there's no requirement any
defense witness or the defendant himself or herself ever
needs to take the stand.

            We will see you back.  And when you get back
in -- we are going to do all this work in the meantime -- and
when we get back in, we are going to get back in at 2:15.  We
usually take an hour and a quarter for lunch.  We need to add
a little bit on.  They need to make their strikes and they
need to take a break themselves.

            The other thing is, I am going to leave in a
moment, and when I do you will be asked to be seated just for
two minutes, two minutes more so the attorneys can decide by
name or the face and then you will be excused.

            Again, you are not to discuss this case during
your break with anyone, including each other.

            If you're not familiar with the downtown area,
we do have a good cafeteria on the first floor, the judges

1    frequent it a lot, if you're interested, on the first floor.
2    If you want to go out of the building, you go out of the
3    building and directly across from us is the Bank of America
4    building.  It's the red brick building with the Gothic spires
5    on them.  If you go into the bank lobby and take the
6    escalator down, right ahead of you will be the entry to the
7    whole downtown tunnel system.  You can go through there.
8    There are many food stores, florists, card shops or whatever,
9    drug stores in there.  It's the whole downtown literally has
10   businesses underneath the city.

11           But also, when you get down to the ground level
12   on the escalator, there's I think at least one restaurant I
13   know of or two right there in the Bank of America building.
14   But if you want to, right ahead of you is the tunnel system,
15   you can take it through.

16           I want to thank the attorneys for their help in
17   putting the charge together, I read it, and for their input
18   that we had up here, and thank you.  We cannot do it, the
19   whole system cannot work without people willing to come down
20   and to serve.

21           But by the way, at the end of the case, I come
22   back and visit with every jury usually for at least an hour,
23   answer any questions that you had about this case or anything
24   else that you've observed down here.

25           So again, I am going to leave, and then be

```
 1    seated for two minutes, and we will see you back outside of
 2    this courtroom at 2:15.
 3              Thank you, and we will see you then.
 4
 5              (Recess taken until 2:15 p.m.)
 6
 7              THE COURT:  Ladies and gentlemen, sorry for the
 8    delay.  I was handling another pretrial matter in a civil
 9    case that's set for trial.
10              As your name is called, please come and be
11    seated in the jury box.  The first seven of you will be in
12    the first row and then the next seven in the back row.
13              CASE MANAGER:  Juror No. 1, ███████████; Juror No.
14    3, ████████; Juror No. 5, ████████; Juror No. 6, █████████
15    ████████; Juror No. 9, █████████; Juror No. 12, ████████
16    ████████; Juror No. 15, █████████; Juror No. 19, ████████
17    ████████; Juror No. 21, █████████; Juror No. 22, ████████
18    ████████; Juror No. 23, █████████; Juror No. 24, ████████
19    ████; Juror No. 25, ███████████, and Juror No. 27,
20    ████████.
21              THE COURT:  Ladies and gentlemen, it looks like most
22    of the strikes were spread out throughout the whole group.  I
23    just want you to know just because you are sitting to my left
24    doesn't mean that you weren't in the jury selection process.
25    It just happened that if they had any strikes, apparently,
```

1  looking at it, a lot of it was further down the line.

2          I do want to say that we certainly appreciate

3  your visit with us.  Hopefully you have gained a bit of an

4  insight into how the system works in your short visit with

5  us.

6          This now completes this portion of your jury

7  service.  Remember, you got to call on the telephone to see

8  if there are any other assignments; but as far as today goes,

9  you're free to leave the building.  Thank you so much for

10  your assistance, and you are free to leave.

11          Ladies and gentlemen of the jury, please stand,

12  raise your right hand, take the juror's oath.

13          CASE MANAGER:  You and each of you do solemnly swear

14  that in the case of the United States against Daniela

15  Gozes-Wagner, the defendant, you will a true verdict render

16  according to the law and the evidence so help you God?

17          JURORS:  "I do."

18          THE COURT:  Thank you.  Please be seated.

19          Ladies and gentlemen, I am sure the first thing

20  on your mind is how long are you going to be here.  The

21  attorneys have estimated, and we'll hold them to it, I will,

22  testimony will be over this week and we'll be moving along at

23  the same clip that you have seen in a lot of the pretrial

24  matters.

25          We operate on the following schedule:  We begin

1    at 10:00 a.m. in the morning and we adjourn at 6:00 p.m. in

2    the afternoon.  As I say, that allows you to miss the rush

3    hour coming in, rush hour going out.  Also, I very often have

4    matters that I attend to from 9:00 to 10:00; it's matters in

5    other civil and criminal cases.  Also I do a lot of things

6    during the noon hour that you're out.

7               We begin at 10:00 a.m. every day except

8    tomorrow.  Every Tuesday we begin at 11:30.  Aside from that

9    we will have full days except probably on Friday we may

10   adjourn a little bit early, but depending upon where we are

11   in the testimony; and even we may be done by then as far as

12   testimony goes, but we will see.

13              We take a break about every hour and a half as

14   the time goes on.  All of those times are approximate except

15   for the starting time.  We try to get underway right at that

16   time.

17              You'll see that as soon as the case begins I

18   will have a white pad over here.  I'll be noting down things

19   about different witnesses, as you may, because you have note

20   taking.

21              Every once in a while when you get out and I

22   need to talk to the attorneys for a few minutes, you will see

23   perhaps I have a red pen.  That means I am entering things in

24   that were done while you were out on a break or happened

25   before the case that I will explain to you afterwards when I

come back and visit with you after the case is over.  All of
the times are approximate, as I say, except for the starting
time.

You have taken an oath which states you are
going to decide the case based upon the evidence and the
evidence alone.  First of all, we don't want you to decide
who you like and dislike and decide the case accordingly.
Therefore, you will have no contact with anyone related to
the case, the attorneys, the parties and the witnesses.  You
may, of course, say good morning or good afternoon to them as
you pass them in the hall, but you may say nothing further,
and you may not extend any favors or accept any favors from
anyone related to the case however slight.

As you notice, there are 14 of you in the jury
box.  With the concurrence of the attorneys, none of you
right now are alternate jurors.  Just because you're sitting
in a certain seat does not mean you are an alternate juror.
Right now there are no alternate jurors.  The way I do it is
a bit unique, but it's been approved in numerous districts
around the country, that at the very end of the case after
all the evidence is over, after you've heard the summation of
the attorneys and after I read the Court's instructions to
you, Ellen, my case manager, will bring a box over to you and
it will have all 14 names in the box.  One of the jurors will
reach up and draw out two names at random, so those will be

the alternate jurors.  Ultimately it will be decided by 12 of
you, but right now there are no alternate jurors, so don't
assume because you are sitting in a certain seat you're an
alternate.  Not so, not in my court.  You won't know that
until the very end.

We do permit you to take notes, but it's only,
if anything, for your own recollection.  Keep in mind if I
need anything read back, I am going to ask Fred Warner, the
court reporter, to read it back, not your notes.  So they're
not evidence or whatever, but you may use them, of course,
for your reference.

As I mentioned, you haven't heard any of the
evidence; we don't know what's coming.  However, when it
comes time for your decision, whatever it is, if it happens
to be a guilty, if it does -- and we haven't heard
anything -- any sentencing matters will be up to me and you
are not to consider it at all, although I will discuss that
with you when I come back later on after the whole case is
over and you've reached a guilty or not guilty verdict.

When you get home this evening I am sure your
friends and family will ask whether or not you have been
selected to serve on a jury.  Of course you may tell them
that you have, but you may say nothing further, because if
you do, you may make a statement that has no relevance
whatsoever to this case but might affect your thinking in

this matter.  So you are not to discuss this case with anyone, even with each other, until the whole case is over until I give you the instructions, until you hear summation and then we pick the alternates and then you're under directions to commence your deliberations.

You're not to make any private investigation concerning this case; you are not to talk to your own lawyer or your own doctor or any health professional or anyone relative this case, anyone else especially that you think would have expert knowledge.  Simply listen to the testimony as it's presented to you from the witness stand and make up your mind based upon that evidence and evidence alone.

About 10 years ago the federal judges in the United States added a short commentary to what's generally a standard initial instruction to the jury:  You are not to do any Google research concerning anything in this case or any texting, tweeting, nothing.  In other words, you are to keep off that relative to this case because you need to get your evidence from the witness stand, nowhere else.  So that all holds true.  It's not that you can't use the internet for everything else, but anything relative to this case or any independent research, you are hereby directed not to do any of that.

If you have any problems during the course of the trial, let a member of the staff know.  If you are

1  delayed in getting here in the morning, you need to give us a
2  call.  During your first break Ellen will give you a contact
3  number directly into the court if you are running late for
4  something like a medical emergency or car breakdown or
5  something like that, but we can't do anything without all 14
6  of you here.

7           Also, as you know, when we take these breaks
8  about every hour-and-a-half, if anybody needs to take a break
9  for any reason whatsoever, get my attention, get my staff's
10 attention or tell the Marshal or get my attention, we can
11 always take a 10-minute break, it's no big deal.  So if
12 anybody needs to take a break for whatever reason, let us
13 know and we will do it.

14          If at any time you can't hear, have trouble
15 hearing, raise your hand to your ear or just say could you
16 speak up or whatever, I will have the witness pull the
17 microphone in or speak up.

18          When we take breaks, you are free in most
19 times, except if it's, I say, a three-or-four-minute break,
20 to leave the jury room if you want to; but when you return
21 from each break, you will remain in the jury room.  You'll be
22 lined up in the sequence of your seating.  So everybody
23 remain standing until the jury is standing in place and then
24 we'll all be seated at the same time.

25          Also, as you note, the federal courthouse is a

1    smoke-free facility.  Certainly you are free to do so outside
2    of the building during any extended breaks.
3              Keep in mind, if you would, both sides, the
4    entity of the government and the individual defendant have
5    waited a while to get to trial.  This is their day in court.
6    It can't be redone later on.  When we're done, you go back to
7    your occupation, go home, I go to my next case, the attorneys
8    go on to their next case; but for the entity of the
9    government in this case and the individual defendant, this is
10   their day in court.
11             What do we have?  A cross-section of the
12   community listening to the facts, and you make the
13   determination, because truly, I'm the judge of law, you're
14   the judge of the facts in this case; and any questions that I
15   ask is just to amplify or to answer a few questions or to
16   clear up matters.  And you'll hear over and over again,
17   including in your last instructions, anything that I say or
18   the attorneys say is not evidence.  The only thing you're to
19   consider is the testimony from the witness stand and the
20   evidence that's been put into trial evidence.
21             We are going to get going pretty quickly.
22   However, I used to get a bunch of questions as to who all
23   these people are, some quite evident.
24             I have the case manager -- no, that's the court
25   reporter.  Court reporter, my case manager, I have two law

clerks; they're law graduates; there here for two years.  One
comes on and one comes off each year, so they have two-year
terms.  And literally, historically I've had between 2 and
300 applicants for one slot per year.  So they got me
outpaced pretty quickly as far as the academics go, but we
are pleased to have them.

Also I have an administrative assistant, and
you will see her perhaps from time to time sitting on the far
side.

Also I have four law students with me for this
semester called interns.  They're here just for the semester.
I had a young man here this morning; we have four of them
from the local schools, and they're here just to assist in
some of the briefing and to learn how it's done as far as the
federal court system goes.

We are about now to commence.  I have a clock
which I am not putting on the attorneys except for their
opening statement.  It's a chess timer.  When their time is
up, they sit down.  You'll see I'll be pushing the buttons.
They know I am not putting a timer on them as far as the case
itself goes.  They have given me an estimate.  I am going to
hold them to it.

But keeping in mind, keeping in mind we have no
obligation whatsoever for a defendant to take the stand or to
make any statement whatsoever, they have that absolute right

1  not to take the stand or even to call any witnesses.  They

2  may, they may not.  And, of course, Mr. Dupont, I am sure,

3  will be asking questions, but there is no really obligation

4  on the defendant.  It's on the government, and they're, I

5  assume, ready to go to trial and they're going to try to meet

6  their burden, prove beyond a reasonable doubt as to each

7  element of what the alleged crime is, and I say alleged.

8            An opening statement is nothing more than a

9  road map of what each side estimates the evidence will be.

10  By the way, if you hear objections coming from either side,

11  don't hold it against the attorneys.  It's their bringing to

12  my attention that they think the rules of evidence --

13  otherwise I keep a book up here.  You will see me sometimes

14  with an objection literally hitting the book.  In federal

15  court most of the evidence and other matters have been

16  determined prior to trial, so it's ready to go.

17

18

19            (Conclusion of Jury Selection)

20

21

22

23

24

25

1    CERTIFICATION

2

3

4

5        I, Fred Warner, Official Court Reporter for the

6    United States District Court for the Southern District of

7    Texas, Houston Division, do hereby certify that the foregoing

8    pages 1 through 122 are a true and correct excerpt transcript

9    of the proceedings had in the above-styled and numbered cause

10   before the Honorable DAVID HITTNER, United States District

11   Judge, on the 25th day of September, 2017.

12        WITNESS MY OFFICIAL HAND at my office in Houston,

13   Harris County, Texas on this the 15th day of September, A.D.,

14   2019.

15

16

17

18

19                          /s/ Fred Warner
                           Fred Warner, CSR
20                         Official Court Reporter

21

22

23

24

25